PEOPLE *v.* SCHEPPS.

1. Criminal Law — Constitutional Law — Rule as to Former Jeopardy Adopted by Federal Courts Followed by This Court.

As a general proposition, the Supreme Court of this State is committed to the views upon the subject of former jeopardy adopted by the Federal courts under the Federal Constitution, although the language in the Michigan Constitution (Art. 2, § 14) differs from that in the Federal.[1]

2. Same—When Accused in Jeopardy.

An accused is *prima facie* in jeopardy when his trial has been entered upon and progressed through selection and swearing a jury, and the court cannot thereafter, through caprice or because of some irritating incident, discharge the jury and call it a mistrial without a bar to a subsequent trial for the same offense.[2]

3. Same—Where No Abuse of Discretion in Declaring a Mistrial Accused Not Entitled to Plea of Former Jeopardy.

Where, shortly after the jury was sworn and before the opening statement was made or any testimony taken, a juror stated that because it had been decided to confine the jury during the trial, he would be prejudiced against the State because he thought it reflected on his honor, the trial judge did not abuse his discretion in declaring a mistrial and discharging the jury, by reason thereof, and, therefore, defendant is not entitled to set up a plea of former jeopardy under the Constitution (Art. 2, § 14).[3]

Error to recorder's court of Detroit; Heston (William M.), J. Submitted April 16, 1925. (Docket No. 122.) Decided May 14, 1925.

Joseph Schepps was convicted of robbery while armed with a dangerous weapon, and sentenced to im-

[1]Criminal Law, 16 C. J. § 360 (Anno); [2]Id., 16 C. J. §§ 363, 394; [3]Id., 16 C. J. §§ 394, 404.

prisonment for not less than 20 nor more than 40 years in the State prison at Marquette.    Affirmed.

*Robert T. Speed,* for appellant.

*Andrew B. Dougherty,* Attorney General, *Robert M. Toms,* Prosecuting Attorney, and *Eugene A. Walling,* Assistant Prosecuting Attorney, for the people.

STEERE, J.    Defendant, Joseph Schepps, was arrested, held for trial to the recorder's court of the city of Detroit and jointly informed against with three claimed associates, charging them with the crime of robbery being armed with dangerous weapons.    As charged in the information and shown by the testimony under which defendant was convicted, the transaction was what is commonly known as a daylight hold-up, in which the defendants while riding in a large sedan car on one of the streets of Detroit pulled up past a car in which the complaining witness, Killoran, was riding alone, crowded him into the curb until he stopped, then held him up with revolvers, pulled his cap down over his eyes, expeditiously plundered him and his car of a bag containing $1,825 and some other articles which took their fancy, and then quickly sped away in their car.    Defendant pleaded not guilty to the information, was separately tried by a jury on March 14, 1922, and found guilty. When the case was called for trial on that day and a jury about to be drawn defendant's counsel interposed a motion for discharge of the accused, based upon the files and records of the case showing that upon the afternoon of March 9, 1922, the case had been called for trial, a jury drawn, examined and sworn and discharged from the case the next morning, without legal cause as was claimed, and trial continued until March 14, 1922.

The only question here pressed for consideration is

that of former jeopardy.   The record shows that on March 9, 1922, this case came up for trial in the recorder's court and a jury was impaneled and sworn, after being accepted by both sides.   The prosecutor then stated he desired to take up a matter with the court in the absence of the jury and by direction of the court the jury was conducted from the court room.   The prosecutor then called the court's attention to an article on the front page of a daily newspaper of that date prejudicially featuring the case, as he claimed, and suggested that the jurors either be especially cautioned on the subject, or if sequestered the officers be instructed to clip such articles from the newspapers before the jury were allowed to have them.   The jury was then called in and the court gave them some instructions as to their conduct, telling them that they would be kept together during the trial, occupying quarters in the building which had been prepared for accommodation of jurors in such cases, and that they should not talk about the case either amongst themselves or with the officers who had them in charge.   They then retired to their jury room. A juror, named Look, soon asked permission to speak with the judge and was allowed to do so, privately at first and apparently until he disclosed what he had in mind, when the matter was publicly taken up in open court as follows:

"*The Court:*  What was it you were trying to explain to the court a moment ago?

"*Juror T. E. Look:*  Why, being that I have not heard any of the facts in the case, I would be prejudiced against the State for locking. me up.

"*The Court:*  Why?

"*Juror:*  Because I feel I am here on my honor and I am willing to work—I am not saying anything about that.

"*The Court:*  Do you realize that it is a matter that is within the discretion of the court?

"*Juror:*  Yes, I do, except the fact—

"*The Court:* Do you feel that under the circumstances, owing to the fact that you are going to be locked up, that you are not going to be able to give the State and the respondent a fair trial?

"*Juror:* Why, I have declared that is how I feel about it.

"*The Court:* Do you think that you are not going to be able to give a fair verdict in this case owing to the fact that the court has seen fit to confine you during this trial?

"*Juror:* Why, I don't think so. I feel this way, your honor: If there has been no facts brought out and there was no question about us jurors being prejudiced by somebody or something like that, I would not feel that way. I don't know anything about the case.

"*The Court:* But you are going on record here in this court by saying that you are not going to be able to give a fair trial in this case owing to the fact that the court has seen fit to confine you. That is true, is it?

"*Juror:* I feel that way, your honor, yes.

"*The Court* (addressing counsel) : Well, what have you to say, gentlemen?"

What if anything was said by counsel is not disclosed, but the record shows further inquiry as follows:

"*Juror:* I am willing to be put on my honor that I won't say anything about it, because there has not been any facts brought out; and that is just the way I feel about it. If anything had been gone into at all, I would not blame you at all for locking us up, because I know that is the procedure. On the other hand, if it is both parties that wants to lock us up, why, I would be prejudiced against both.

"*The Court:* Well, who is locking you up?

"*Juror:* I think it is the State.

"*The Court:* I'll tell you it is the court. The State has nothing to do with it, neither has the defendant or his counsel.

"*Juror:* Well, that being the case, it sort of removes my prejudice. I thought it was the State or the city.

"*The Court:* Neither the city nor the State has anything to do with it, neither has the defendant nor

his counsel said anything to me.    I am to blame for your being confined.

*"Juror:* Well, I can't have any prejudice against you—it wouldn't pay.

*"The Court:* Well, do you still think that you would be able to sit as a fair and impartial juror in the case?

*"Juror:* Why, now that you have explained the circumstances, I believe that I could, regardless of inconvenience.

*"The Court:* All right."

The jury was then put in charge of an officer and the court adjourned until the following morning.    On the opening of court the next morning it was called to the attention of the presiding judge that Juror Look had undertaken to interrogate the officer in charge on the subject and the latter when called before the court and sworn testified that Look had asked him how long they would keep them locked up if they couldn't agree, to which the officer had replied that it was discretionary with the court.    The prosecutor then urged that the attitude of the juror after learning the jury would be confined during the trial and his declaration to the court that it would prejudice him against the State was manifestly prejudicial to an impartial administration of justice, giving rise to an overruling necessity for discharging the jury and moved the court to declare the proceeding a mistrial.    To this counsel for defendant objected.    The court thereupon said:

"Under all the circumstances the court feels that it is his duty to grant the motion just made by the prosecuting attorney, and the court does declare this is a mistrial."

Counsel for defendant then moved his discharge on the ground he has been once placed in jeopardy by calling and swearing a jury, and the action of the court in discharging the jury at that stage of the proceedings amounted in legal effect to discharging

the prisoner.    This motion was denied and exception taken.    The case was then adjourned for trial until March 14th next.    When the case was called on that date, objection was made to a retrial because of former jeopardy, as before related.

Our first Constitution, of 1835, adopted the technical word "jeopardy" of the common law and provided in its declaration of rights that "No person, for the same offense, shall be twice put in jeopardy of punishment" (Art. 1, § 12).    The framers of our Constitution of 1850, presumably familiar with the constitutional provision on the subject, rejected the technical phraseology there used; saying in concise and plain terms, "No person after acquittal upon the merits shall be tried for the same offense" (Art. 6, § 29).    In like language our present Constitution provides: "No person, after acquittal upon the merits, shall be tried for the same offense" (Art. 2, § 14).    Just how under that provision of our Constitution the mere act of administering the oath to a jury amounts to an "acquittal upon the merits" of one accused of crime before even a word of testimony has been heard, is a question which apparently necessitates resort to the omitted technical word jeopardy for an answer.    It may be conceded as a generally recognized rule of bench law when unmodified by constitutional or statutory provision, that jeopardy attaches as soon as a jury is called and sworn for the trial of an accused under a valid indictment or information for a felony, and this court has at times applied it to our constitutional provision, although it will be found in most of the cases where that rule is ˙recognized testimony was heard˙and the merits of the case entered upon before the jury was discharged.    Such was the case in *People* v. *Taylor,* 117 Mich. 583, cited for defendant.    It was there said:

"Our own Constitution may be thought to have been intended to limit this immunity to cases where the

acquittal has been upon the merits.  *  *  *  But it was held otherwise in the case of *People* v. *Harding,* 53 Mich. 485."

The *Harding Case,* also cited for defendant, had been twice before tried upon its merits, resulting both times in a disagreement of the jury.   A plea of former jeopardy was urged in bar against another trial but not sustained and the conviction on a third trial affirmed, it being held within the power of the trial court to pass upon the impossibility of an agreement and the necessity of discharging the jury before verdict.   That was the controlling question in the case, and what was said as to acquittal on the merits was not essential to a disposition of the case.   In those comments the court refers to the case of *People* v. *Jones,* 48 Mich. 554, also cited for defendant, which was said to be "not very fully reported."   The attorney general there confessed error, which may have given the court a wrong impression as to what the record disclosed.   An examination of the original record of that case on file in this court shows it to consist of certified copies of the circuit court's files and records of the case, in manuscript, returned by the clerk of the trial court in response to the writ of error, and defendant's assignments of error thereon. No briefs or bill of exceptions are shown to have been filed.   The plea of former acquittal sets up a former trial, the impaneling of a jury, taking of the people's testimony and discharge of the jury before verdict, without setting up the cause of discharge as required (*People* v. *White,* 68 Mich. 648), but reference is made to "the record thereof" where said proceeding "more fully and at large appears."   The certified copy of the journal entry of the proceeding complained of states it was there made to satisfactorily appear to the court by testimony produced *in behalf of the defendant—*

"that Frederick Snyder a juror sitting on the panel sworn to try said cause has expressed a positive opinion as to the guilt of said respondent and is not qualified to sit as said juror; therefore on motion of W. F. Riggs, attorney for said respondent, it is ordered that said Frederick Snyder be and is hereby excused from said panel, that a talesman be called, and that the trial of said cause be commenced anew."

This court has more than once since then, and as late as *People* v. *Fochtman,* 226 Mich. 53, held that where such action is taken on the motion or by consent of the accused it will not operate as an acquittal, or former jeopardy.

In the case of *In re Ascher,* 130 Mich. 540 (57 L. R. A. 806), it was held that defendant was not placed in jeopardy by the court discharging the jury after it had been sworn and testimony given, where it was found that certain of the jurors were so prejudiced as to be unfit to sit in the cause and the misconduct of the officer in charge of the jury appeared to the court prejudicial to a fair and impartial trial. In a carefully considered opinion reviewing various phases of the question at length with quotations from authorities cited it was said of our constitutional provision: "While this language differs from that in the United States Constitution the law of jeopardy is doubtless the same under both." The views there expressed have been adopted and applied in our subsequent cases involving the question of former jeopardy until it can be said as a general proposition that this court is now committed to the views upon that subject adopted by the Federal courts under the United States Constitution. To the point of the power of the trial court to discharge the jury for cause shown after the trial has been entered upon without its operating to discharge the defendant, this court has twice quoted with approval the following conclusions

of the United States Supreme Court in *United States v. Perez,* 22 U. S. 579:

"We think, that in all cases of this nature, the law has invested courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere."

Under the rule which now obtains in this jurisdiction the accused is *prima facie* in jeopardy when his trial has been entered upon and progressed through selection and swearing a jury, the court then being fully organized for and committed to his trial. The court cannot thereafter through caprice or because of some irritating incident of the trial discharge the jury and call it a mistrial, without raising a bar to subsequent trial for the same offense (*People* v. *Brosky,* 222 Mich. 651). While that limited and conditional power to discharge the jury is recognized as reserved to the court for those rare cases where a manifest necessity arises or facts are discovered showing in the opinion of the court that the ends of public justice would otherwise be defeated, it should when not consented to by the defense be given careful consideration and only exercised when conditions in the nature of an emergency have risen satisfying the court that manifest necessity or the ends of justice make it imperative.

In the instant case, shortly after the jury was sworn and before the opening statement was made or any testimony taken, a juror of apparently peculiar bent of mind asked for an interview with the judge which led to an open investigation by the court as to his competency to act in the case as a juror. In his

examination he clung quite tenaciously to his idea
that sequestering the jury reflected on his honor and
prejudiced him in the case.    When the court asked
him if he understood it was a matter in the discretion
of the court he said he did, and when asked if he
felt under the circumstances that owing to the fact
he would be locked up he would not be able to give
the State and respondent a fair trial, he said he had
declared that was how he felt about it.    When squarely
asked: "*Q.* Do you think that you are not going to
be able to give a fair verdict in this case owing to
the fact that the court has seen fit to confine you dur-
ing this trial?" he replied, "Why, I don't think so."
And later asked, "*Q.* But you are going on record
here in this court by saying you are not going to
give a fair trial in this case owing to the fact the
court has seen fit to confine you.    That is true, is it?"
he replied "I feel that way, your honor, yes."    Later
in his rambling answers he said he thought the State
was locking him up, and when told by the judge that
it was he himself was to blame for the juror being
confined he hedged with the reply, "Well, I can't have
any prejudice against you, it wouldn't pay."    When
pressed by the court with further inquiries he finally
emphasized his thought that he couldn't have any
prejudice against the court, as "it wouldn't pay," by
saying that with the explanation of the court he had
come to believe that he could sit as a fair and impartial
juror, "regardless of the inconvenience."

   We are unable to give the importance urged for
the defense to the judge's incidental remark "All
right" just before adjourning court for the day.    Even
if he meant the juror was all right to serve in the
case it was within the power of the court to change
such ruling after deliberating on the question over
night and before the trial proceeded further.    What
was made known on convening of the court the follow-
ing morning as to the juror interrogating the officer

simply showed a continuation of his frame of mind over being locked up. There are many things in an incident of this kind which cannot be plainly portrayed in a printed record. As an aid in judging his qualifications and peculiarities the court saw and heard the juror and could note his appearance and attitude, tone of voice and manner of testifying when undergoing the investigation he had brought upon himself. It may be true as urged by the defense that jurors are often, or usually, dissatisfied when ordered sequestered, but if so they generally have intelligence enough to understand the situation and reason therefor, and to accept it in a complacent frame of mind as one of the attendant inconveniences of their service when drawn as jurors.

This court is not required to pass upon the wisdom of the course the trial court pursued, but upon whether there were sufficient circumstances shown for a basis of the trial court's decision that the juror was disqualified from serving in the case and in that connection whether it affirmatively appears there was an abuse of the discretion with which the trial court was endowed. To constitute a finding of former jeopardy requiring us to reverse this case and discharge the defendant the action of the trial judge must have been such that this court can affirmatively find there was no manifest necessity or that the ends of public justice would not have been otherwise defeated. Upon this record we are unable to so find.

The judgment will stand affirmed.

McDONALD, C. J., and CLARK, BIRD, SHARPE, MOORE, FELLOWS, and WIEST, JJ., concurred.