PEOPLE v HARDING
PEOPLE v BUSH

Docket Nos. 91097, 91177. Argued March 31, 1993 (Calendar Nos. 6-7 April). Decided September 14, 1993.

On May 5, 1983, Jeffrey Dudley was assaulted and robbed by Reginald H. Harding, Jr., and Christopher C. Bush, and left to die. His attackers each were convicted in separate trials in the Oakland Circuit Court, George LaPlata, J., of armed robbery, assault with intent to commit murder, and two counts of possession of a firearm during the commission of a felony. The Court of Appeals affirmed in separate unpublished opinions per curiam (Docket Nos. 75573, 84631). Over four years later, on June 27, 1987, Mr. Dudley died as a result of his original injuries. Thereafter, the defendants were charged with felony murder and felony-firearm. Separate juries in the Oakland Circuit Court, Richard D. Kuhn, J., convicted Harding of felony murder and Bush of felony murder and felony-firearm. The Court of Appeals, WAHLS, P.J., and DOCTOROFF and G. S. ALLEN, JJ., affirmed the convictions of felony murder, but reversed Bush's conviction of felony-firearm as being violative of double jeopardy. In addition, it vacated the defendants' previous convictions on double jeopardy grounds and extended sentence credit for the time served (Docket Nos. 108830, 109727). The defendants appeal.

In an opinion by Justice BRICKLEY, joined by Justices GRIFFIN and MALLETT, and opinions by Justices RILEY and BOYLE and Chief Justice CAVANAGH, joined by Justice LEVIN, separate majorities of the Supreme Court *held:*

The prosecutions of the defendants for felony murder are not barred by the double jeopardy provisions of the federal or state constitutions. The defendants are entitled to vacation of their armed robbery, assault with intent to murder, and felony-firearm convictions resulting from their first trials, and to sentence credit for the time served.

1. Under state and federal constitutional and case law, it was not a violation of double jeopardy to charge, try, and convict the defendants of felony murder after their prosecutions for other crimes arising out of the same conduct.

2. Because felony murder carries a mandatory penalty of

imprisonment for life without parole, while armed robbery is punishable by life or any term of years with the possibility of parole, imposing sentences for both crimes is violative of double jeopardy. Likewise, punishment of felony murder and the lesser included offense of assault with intent to commit murder is violative. Double jeopardy protection requires that the defendants not receive a form of multiple punishment that could not have been exacted had they been prosecuted for their ultimate culpability in their first trials.

3. Because the felony murder convictions are valid, so is Bush's accompanying felony-firearm conviction. However, because the defendants' original felony-firearm convictions were based on their convictions of armed robbery and assault with intent to commit murder, which were vacated by the Court of Appeals, the original felony-firearm convictions similarly should be vacated. Granting credit for time served is appropriate.

Justice RILEY, concurring in part and dissenting in part, stated that in this case the conviction of and sentencing for felony murder and armed robbery are not barred by the Double Jeopardy Clause. The Legislature intended separate punishment for felony murder and armed robbery, as revealed by the maximum punishment for each offense and the distinct societal interests served by their prohibiting statutes, i.e., homicide committed in the course of aggravated circumstances and taking property by force or threat of force while armed.

Justice BOYLE, concurring, stated that while, in this case, charging, trying, and convicting the defendants of felony murder after their prosecution for other crimes arising from the same conduct did not violate double jeopardy guarantees, and their armed robbery convictions should not have been vacated, the potential of an open-ended definition of proximate cause, in which assaults may become murders years after the initial incident upon a factfinder's determination that death was the natural result of the original criminal act, is unsettling. Advancements in medical science, both in prolonging life and in identifying contributing causes of death, suggest that in the context of another case the question of causation in fact and in law might be measured by a different calculus.

Chief Justice CAVANAGH, joined by Justice LEVIN, concurring in part and dissenting in part, further stated that the prosecutor failed to present sufficient evidence to prove beyond a reasonable doubt that the defendants proximately caused the victim's death.

In order to convict a defendant of felony murder, it must be

shown that the defendant's acts proximately caused the victim's death. Proximate cause requires a sufficient causal connection between the defendant's conduct and the result of the conduct, i.e., the death must have been the natural, direct, and necessary result of the defendant's unlawful act. The criminal standard for proximate cause requires a more direct causal connection than that in tort.

In this case, intervening or superseding causes negate proximate cause. The victim knew the limitations on his physical activities, yet chose to disregard them. In so doing, he proximately caused his death. The judgment of the Court of Appeals should be vacated and the defendants' convictions of felony murder and Bush's accompanying conviction of felony-firearm should be reversed.

Affirmed in part and reversed in part.

187 Mich App 316; 466 NW2d 736 (1990) affirmed in part and reversed in part.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *Richard Thompson,* Prosecuting Attorney, *Michael J. Modelski,* Chief, Appellate Division, and *Thomas S. Richards,* Assistant Prosecuting Attorney, for the people.

*Elizabeth L. Jacobs* for the defendant in *Harding.*

*Michael J. McCarthy* for the defendant in *Bush.*

BRICKLEY, J. We granted leave to appeal in these cases to consider the double jeopardy implications of a criminal prosecution in which the defendants were tried and convicted of armed robbery, assault with intent to commit murder, and two counts of felony-firearm arising out of those felonies; and then, over four years later, after the victim died as a result of the assault, were prosecuted and convicted of felony murder and felony-firearm. For the reasons stated below, we hold that the subsequent prosecutions are not barred by the United States or Michigan Constitutions; however, we also hold

that the defendants are entitled to relief from the convictions resulting from the first trial.

I

Defendants were convicted of armed robbery,[1] assault with intent to commit murder,[2] and two counts of possession of a firearm during the commission of a felony[3] in December 1983. The robbery occurred in the City of Troy on May 5, 1983. The victim was able to produce only one dollar. He was shot once in the heart and once in the abdomen, and then thrown headfirst into a sewer to die. The victim survived.

More than four years later, after numerous surgeries, the implementation of a number of pacemakers, many tests, and medication, the victim, Mr. Jeffrey Dudley, was apparently attempting to lead a "normal" life.[4] At a family gathering on

---

[1] MCL 750.529; MSA 28.797.

[2] MCL 750.83; MSA 28.278.

[3] MCL 750.227b; MSA 28.424(2).

[4] On the night of the assault the surgeon on call at Detroit Receiving Hospital, Doctor Michael Kaplan, performed emergency surgery on Mr. Dudley to repair a laceration to the left ventricle of his heart, to remove a damaged portion of his left lung, and to repair a partial abrasion of his large intestine. Shortly thereafter a surgery was again performed to insert a chest tube for his lung and to remove a bullet from his abdomen.

In October 1983, Mr. Dudley collapsed in a shopping mall, which resulted in the implantation of a pacemaker. Later in October, Doctor Hahn J. Lee performed a heart catherization and determined that there was very high pressure, three or four times higher than normal, backing up in the left ventricle and that the heart muscle was so stiff it was unable to accommodate the blood required to meet the body's demands.

In December 1984, Doctor Lee became Mr. Dudley's treating cardiologist. At that time two stress tests were performed revealing that Mr. Dudley's heart was as weak as that of an eighty-five-year-old man. He could not walk two street blocks at a leisurely pace without becoming dizzy and his blood pressure dropping. Doctor Lee warned Mr. Dudley not to do anything strenuous, not to get upset, and to "live like an old man."

June 28, 1987, the victim was participating in a two-on-two, half-court basketball game for between sixty and ninety minutes. During the course of the game an argument ensued and turned to fisticuffs, quickly ending when Mr. Dudley began having convulsions. He died shortly thereafter.

One year later, in December 1985, Doctor Lee conducted another stress test in which Mr. Dudley performed much worse than the first one. The doctor testified that a seventy-year-old woman with arthritis could do almost as well and that his blood pressure was "nose-diving." At that point his pacemaker was changed to a more sophisticated model, and he was put on medication and blood thinners. A follow-up stress test was conducted in April 1986, which showed slight improvement to the level recorded during the first stress test, but far below (about twenty-five percent) what a man at his age should be able to do. Doctor Lee told Mr. Dudley that there was nothing more that could be done and that he was going to have to learn to live with his limitations, with an eye toward a heart transplant in the future.

The last stress test given by Doctor Lee was in March 1987. The doctor testified that the heart was declining from the date he met Mr. Dudley—"It was a steady downhill course." The doctor told him that it did not look good, that a heart transplant was a possibility, and that he was to look out for himself.

Dr. Lee described Mr. Dudley as a "time bomb" with respect to any activity or emotional upset that pushes the heart beyond the tolerance limit. He testified that if Mr. Dudley had gotten used to watching out for himself and avoided strenuous exercise he would have lived longer. The chances of someone in Mr. Dudley's situation living five years was less than fifty percent; the chances for him to live another twenty-five years was nil. Finally, the doctor testified that for Jeffrey Dudley playing basketball was tantamount to suicide.

Mr. Dudley's mother, Gladys Dudley, testified that her son had been a very active young man. He had five jobs, went to college, and still had time for recreation and dating. After the assault, his health was extremely poor. He was unable to take walks without losing his breath, and sometimes he would have shortness of breath while just sitting still. He was very limited in his activity. The doctor had told her that he was not improving, which confirmed her own observations of her son. She testified that in 1986 her son "could tell that he wasn't improving and he decided that whatever he did he had to live as normal a life as possible, and he wanted to get married so he became engaged and then they got married."

Mr. Dudley's wife, who had been dating him even before the assault, gave conflicting testimony with regard to whether he was living a "normal" life. At one point she testified that he had some limitations as far as activities went and could exercise in moderation, but later she stated that she knew nothing about warnings by his doctor that he would have to avoid some of the more strenuous activities and reduce his hours at work, and she did not notice that he had made any change in his activity.

An autopsy revealed that the cause of death was a result of the permanent damage to Mr. Dudley's heart caused by the gunshot wound inflicted in May 1983.[5] Defendants Harding and Bush were then charged with statutory felony murder[6] and another count of felony-firearm. Motions to dismiss the charges on the basis of double jeopardy were denied in the district and circuit courts.

During a joint trial with separate juries, defense counsel vehemently argued that there were intervening events that broke the chain of causation, namely, the passage of time and the failure to refrain from engaging in strenuous activity. Harding was found guilty of felony murder and not guilty of felony-firearm. Bush was found guilty of felony murder and felony-firearm.

The Court of Appeals consolidated both appeals. It held, inter alia, that the prosecution and conviction of defendants of felony murder were not precluded by double jeopardy, but that Bush's second conviction and sentencing for felony-firearm were. The Court further held that both defendants' prior convictions and sentences for

---

[5] There was conflicting medical testimony regarding the actual cause of death. The defense called an expert witness who testified that the seizure indicated that there was a blow to his head causing the brain to send improper signals to the heart, which in fact caused the heart to stop pumping. Defendant Harding argues that the evidence was insufficient to support the verdict, mainly because the autopsy failed to produce slides of brain tissue enabling the examiner and other doctors to definitively consider, and rule out, brain damage as the cause of death. The medical examiner testified that the cranium was opened and the brain actually examined, revealing no injury to the brain or skull. Another doctor testified that a blow severe enough to cause a convulsion would have produced obvious evidence such as a cracked skull or brain hemorrhage. The same doctor testified that, generally, a convulsion is a reaction by the brain when it is simply deprived of oxygen. We believe this question was adequately presented to the jury, and that it was properly instructed. See *People v Hampton*, 407 Mich 354, 368; 285 NW2d 284 (1979); *People v Petrella*, 424 Mich 221, 268; 380 NW2d 11 (1985).

[6] MCL 750.316; MSA 28.548. Statutory felony murder in Michigan differs from its common-law counterpart.

armed robbery and assault with intent to commit murder, in light of the felony murder conviction, were violative of the protection from double punishment and were to be vacated and set aside, and that the time served by defendants as a result of their earlier convictions was to be credited to the sentences imposed for felony murder.[7]

II

The double jeopardy provision of the Fifth Amendment of the United States Constitution states that "[n]o person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb . . . ." This provision is applicable to the states through the Fourteenth Amendment. *Benton v Maryland,* 395 US 784; 89 S Ct 2056; 23 L Ed 2d 707 (1969). The double jeopardy guarantee protects against successive prosecutions for the same offense and protects against multiple punishments for the same offense. *North Carolina v Pearce,* 395 US 711, 717; 89 S Ct 2072; 23 L Ed 2d 656 (1969). The protection of each interest has operated in distinct ways, and the analysis utilized in fashioning each protection has differed.

This case involves both protections. We first address the question whether it was a violation of the Fifth Amendment to prosecute these defendants for felony murder after they had been convicted of crimes involving the same conduct, and then address the question of multiple punishments.

### A. SECOND PROSECUTION FOR SAME OFFENSE

#### 1. FEDERAL CONSTITUTION

The purpose of the double jeopardy provision of

---

[7] However, the Court of Appeals let stand the prior felony-firearm convictions for each defendant, holding that it was the subsequent felony-firearm conviction that violated double jeopardy.

the Fifth Amendment has been stated by the
United States Supreme Court:

> [T]he State with all its resources and power
> should not be allowed to make repeated attempts
> to convict an individual for an alleged offense,
> thereby subjecting him to embarrassment, expense
> and ordeal and compelling him to live in a contin-
> uing state of anxiety and insecurity, as well as
> enhancing the possibility that even though inno-
> cent he may be found guilty. [*Green v United
> States,* 355 US 184, 187-188; 78 S Ct 221; 2 L Ed 2d
> 199 (1957). See also *People v Grimmett,* 388 Mich
> 590, 597; 202 NW2d 278 (1972).]

The general rule for determining whether two
offenses are materially indistinguishable so as to
prevent a double punishment or successive pros-
ecution under the United States Constitution was
set forth in *Blockburger v United States,* 284 US
299, 304; 52 S Ct 180; 76 L Ed 306 (1932).[8] See
*Brown v Ohio,* 432 US 161, 166; 97 S Ct 2221; 53 L
Ed 2d 187 (1977), *Garrett v United States,* 471 US
773, 778-779; 105 S Ct 2407; 85 L Ed 2d 764 (1985),
and *United States v Dixon,* 509 US —; 113 S Ct
2849; 125 L Ed 2d 556 (1993). However, the general
rule of *Blockburger* does not operate without its
exceptions, and, in fact, its application in recent
years has been called into question in certain
circumstances. See *Brown* at 166, n 6, and *Whalen
v United States,* 445 US 684, 709; 100 S Ct 1432;
63 L Ed 2d 715 (1980) (Rehnquist, J., dissenting).

In the present case, but for the subsequent death
of the victim, it would appear that we are faced

---

[8]   The applicable rule is that where the same act or transaction
constitutes a violation of two distinct statutory provisions, the
test to be applied to determine whether there are two offenses
or only one, is whether each provision requires proof of a fact
which the other does not.

with a clear double jeopardy violation;[9] however, because of the subsequent death, the cases are easily distinguishable. *Diaz v United States,* 223 US 442; 32 S Ct 250; 56 L Ed 500 (1912), presented similar facts.[10] The defendant, "by blows and kicks," inflicted bodily injuries upon the victim and was charged with assault and battery, tried, and found guilty. Subsequently, the victim died, and the defendant was charged with homicide. Relying on the testimony from the assault and battery hearing, the statement of the defendant, and the autopsy report, the defendant was convicted by "the court of first instance." The United States Supreme Court affirmed and held:

> The homicide charged against the accused in the Court of First Instance and the assault and battery for which he was tried before the justice of the peace, although identical in some of their elements, were distinct offenses in law and in fact. The death of the injured person was the principal element of the homicide, but was no part of the assault and battery. At the time of the trial for the latter the death had not ensued, and not until it did ensue was the homicide committed. Then, and not before, was it possible to put the accused in jeopardy for that offense. [*Diaz* at 448-449.]

This exception to the bar against double jeopardy has been cited with approval for years in a variety of circumstances. In *Brown,* the Supreme

---

[9] In *Harris v Oklahoma,* 433 US 682; 97 S Ct 2912; 53 L Ed 2d 1054 (1977), the Supreme Court held that the Double Jeopardy Clause bars the prosecution for armed robbery after prosecution for felony murder where the armed robbery was the predicate crime for the felony murder. *Brown* held that the order of the prosecutions is irrelevant.

[10] Although *Diaz* did not involve the federal constitutional right to be free from double jeopardy, but, rather, a statutory right under previous regulation of the Territory of the Philippines by the United States, we find it persuasive for a similar interpretation of the federal constitution.

Court, while interpreting the *Blockburger* rule and holding that the Fifth Amendment forbids successive prosecutions and cumulative punishments for greater and lesser included offenses, regardless of their sequence, stated:

> An exception may exist where the State is unable to proceed on the more serious charge at the outset because the additional facts necessary to sustain that charge have not occurred or have not been discovered despite the exercise of due diligence. [*Brown* at 169, n 7 (citing *Diaz* and *Ashe v Swenson*, 397 US 436, 453, n 7; 90 S Ct 1189; 25 L Ed 2d 469 [1970] [Brennan, J., concurring]).]

In another double jeopardy case decided the same term as *Brown*, the Court, while discussing the rule established in *Brown*, stated that it "does have some exceptions. One commonly recognized exception is when all the events necessary to the greater crime have not taken place at the time the prosecution for the lesser is begun." *Jeffers v United States*, 432 US 137, 151; 97 S Ct 2207; 53 L Ed 2d 168 (1977).

Similarly, in a "continuing criminal enterprise" case, where three predicate crimes are required to establish the continuing criminal enterprise, the Supreme Court held that there was no double jeopardy violation where the facts underlying a prior conviction served to prove one of the predicate crimes. *Garrett, supra.* The Court determined that Congress intended a continuing criminal enterprise to be a separate offense and to authorize prosecution and punishment for both the predicate crimes and the continuing criminal enterprise. In ruling on the constitutionality of the prosecution of the continuing criminal enterprise after a previous prosecution for a predicate offense, the Court compared the case with *Diaz.* Just as the homicide

had not occurred at the time of the trial for the assault and battery, the continuing criminal enterprise had not been completed at the time of the prosecution for the predicate crime. As a result, the Court held that there was no double jeopardy violation.

Defendant Bush argues that *Diaz* does not apply because "the analysis in *Diaz* is based upon the elements of the crimes involved and not the criminal conduct upon which a prosecution would be based."[11] We read this statement as distinguishing between the *Blockburger* "statutory elements" test and the *Grady* "same conduct" test, which is no longer a viable distinction.[12] Because the facts of this case fit squarely within the very exception developed .in *Diaz*,[13] we hold that the subsequent prosecution of these defendants does not violate the Fifth Amendment.

## 2. STATE CONSTITUTION

The double jeopardy provision of the Michigan Constitution provides that "[n]o person shall be subject for the same offense to be twice put in jeopardy." Const 1963, art 1, § 15. Although *People v White*, 390 Mich 245; 212 NW2d 222 (1973), in

[11] This is the extent of the defendants' argument discussing why the *Diaz* exception should not apply.

[12] The defendants argue that the new rule set forth in *Grady v Corbin*, 495 US 508, 510; 110 S Ct 2084; 109 L Ed 2d 548 (1990), bars their subsequent prosecution for felony murder based on armed robbery because the state proved conduct that constituted an offense for which they had already been prosecuted. However, the defendants' argument fails for two reasons. The test of *Grady* has been overruled by *Dixon, supra,* and even *Grady* recognized the exception outlined in *Diaz.*

[13] For other cases acknowledging the *Diaz* exception, see *Blackledge v Perry*, 417 US 21, 29, n 7; 94 S Ct 2098; 40 L Ed 2d 628 (1974), *Illinois v Vitale*, 447 US 410, 420, n 8; 100 S Ct 2260; 65 L Ed 2d 228 (1980), and *United States v Goodwin*, 457 US 368, 376, n 8; 102 S Ct 2485; 73 L Ed 2d 74 (1982).

which this Court seemed to give a broader interpretation of the Michigan Double Jeopardy Clause by holding that *Blockburger* is not the test for determining double jeopardy violations under the Michigan Constitution in the successive prosecution context and instead adopting the "same transaction" test, we nonetheless recognized the *Diaz* exception.

> In adopting the same transaction test, we limit our holding to the facts of the present case and to similar factual situations.
> We are aware that in certain situations, strict application of the same transaction test could lead to the anomalous result of foreclosing prosecution for an offense where the state had made a diligent and good faith effort to protect the defendant's constitutional rights.
> "For example, where a crime is not completed or not discovered, despite diligence on the part of the police, until after the commencement of a prosecution for other crimes arising from the same transaction, an exception to the 'same transaction' rule should be made to permit a separate prosecution." *Ashe v Swenson,* 397 US 436, 453, n 7; 90 S Ct 1189, 1199; 25 L Ed 2d 469, 481 (1970) (Brennan, J., concurring) [citing *Diaz*]. We emphasize that our primary objective in adopting the same transaction test is to insure that a criminal defendant receives meaningful protection under the double jeopardy clause. If actual situations should arise in which application of the same transaction test would not serve that objective, we will, in such case, consider the adoption of limited exceptions to the same transaction test. [*White* at 258, n 6.]

Therefore, it is clear the exception set forth by this Court in *White* duplicates the exception outlined by the United States Supreme Court in *Diaz,* restated in *Brown* and *Jeffers,* and applied in *Garrett.* Accordingly, we hold that it was not a

violation of the Double Jeopardy Clause of either
the United States or the Michigan Constitution to
charge, try, and convict these defendants of felony
murder after the prosecution for the other crimes
arising out of the same conduct. Having so held, it
is now necessary to analyze the constitutional
implications of the penalties imposed on these
defendants for the previous crimes in light of the
statutory felony murder conviction.

### B. MULTIPLE PUNISHMENTS FOR THE SAME OFFENSE

The principal thrust of double jeopardy protec-
tion by the very terms of our federal and state
constitutional provision is protection from re-
peated prosecutions for the same criminal offense
arising out of the same conduct. The concept of
multiple punishment in double jeopardy jurispru-
dence has as its purpose the avoidance of more
than one punishment for the same offense arising
out of a single prosecution. This occurs most often
in dealing with lesser included and compound
offenses. In the case before us the multiple punish-
ment challenge is made more difficult by the fact
that the punishment exacted has resulted from
successive prosecutions.

### 1. FEDERAL CONSTITUTION

In the cases in which the United States Supreme
Court has addressed the issue of multiple punish-
ments in successive prosecutions, its analysis has
remained consistent with the cases involving mul-
tiple punishments in single prosecutions.

In *Jeffers, supra,* the Court faced the successive
prosecutions of conspiring to distribute controlled
substances and conducting a continuing criminal
enterprise to violate drug laws. After a majority of

the Court found that the defendant could constitu-
tionally be tried separately by his request, it then
reached the issue of multiple punishment. In so
discussing, four justices adhered to the view that

> [t]he critical inquiry is whether Congress intended
> to punish each statutory violation separately. . . .
> If some possibility exists that the two statutory
> offenses are the "same offense" for double jeopardy
> purposes, however, it is necessary to examine the
> problem closely, in order to avoid constitutional
> multiple-punishment difficulties. [*Id.* at 155.]

The Court continued by performing a legislative
intent analysis and found that Congress did not
intend to impose cumulative penalties for commit-
ting the crimes at issue. Interestingly, the opinion
cited all single prosecution-multiple punishment
cases for the above proposition, indicating that the
two related issues are to be analyzed similarly.
Compare *Brown* at 166-167.

The most recent decision of the United States
Supreme Court applying a legislative intent analy-
sis to a successive prosecution-multiple punish-
ment case occurred in *Garrett, supra.* A majority
of the Court, after holding that prosecuting a
continuing criminal enterprise offense after a prior
conviction for one of the predicate offenses does
not violate the Double Jeopardy Clause, recon-
firmed the plurality in *Jeffers* by relying on still
other single prosecution-multiple punishment
cases for the proposition that legislative intent
controls the imposition of multiple penalties. *Gar-
rett* at 793.[14]

---

[14] Although cases involving multiple punishments in single prosecu-
tions occur more frequently, the rule that determines double jeopardy
violations is the same—legislative intent controls. See the cases cited
in *Jeffers* at 155. See also *Whalen v United States, supra* at 688-689,
*Albernaz v United States,* 450 US 333, 344; 101 S Ct 1137; 67 L Ed 2d

The United States Supreme Court, as evidenced in the foregoing cases, although not abandoning the *Blockburger* test but veritably cutting back on its application as the rule, now views it as simply a method of determining legislative intent.

> The *Blockburger* test is a "rule of statutory construction," and because it serves as a means of discerning congressional purpose the rule should not be controlling where, for example, there is a clear indication of contrary legislative intent. [*Albernaz v United States,* 450 US 333, 340; 101 S Ct 1137; 67 L Ed 2d 275 (1981). See also *Missouri v Hunter,* 459 US 359, 367; 103 S Ct 673; 74 L Ed 2d 535 (1983), and *Garrett* at 778-779.]

The United States Supreme Court must accept a state court's interpretation of the intent of state legislation. See *Ohio v Johnson,* 467 US 493, 499; 104 S Ct 2536; 81 L Ed 2d 425 (1984).[15] However, we need not interpret the statutes at issue if the Michigan Constitution provides relief to these defendants.

### 2. STATE CONSTITUTION

In *People v Robideau,* 419 Mich 458; 355 NW2d 592 (1984), we traced the development of this concept and the standards for determining the parameters of double jeopardy.

---

275 (1981), *Missouri v Hunter,* 459 US 359, 367-368; 103 S Ct 673; 74 L Ed 2d 535 (1983), *Ohio v Johnson,* 467 US 493, 499; 104 S Ct 2536; 81 L Ed 2d 425 (1984), *Jones v Thomas,* 491 US 376, 381; 109 S Ct 2522; 105 L Ed 2d 322 (1989), and *United States v Halper,* 490 US 435, 450-451; 109 S Ct 1892; 104 L Ed 2d 487 (1989).

[15] In *Whalen* at 688, the Court refused to extend its customary deference to the local court for its interpretation of the statutes. However, in *Missouri v Hunter,* n 14 *supra* at 368, the Court stated it was "bound to accept the Missouri court's construction of that State's statutes," citing *O'Brien v Skinner,* 414 US 524, 531; 94 S Ct 740; 38 L Ed 2d 702 (1974). See also *Garner v Louisiana,* 368 US 157, 169; 82 S Ct 248; 7 L Ed 2d 207 (1961), and *Brown* at 167.

Different interests are involved when the issue is purely one of multiple punishments, without the complications of a successive prosecution. The right to be free from vexatious proceedings simply is not present. The only interest of the defendant is in not having more punishment imposed than that intended by the Legislature. The intent of the Legislature, therefore, is determinative. Under neither the federal nor the Michigan double jeopardy provisions does this Court sit as a superlegislature, instructing the Legislature on what it can make separate crimes. As previously described, prior decisions of this Court have applied a factual test in single-trial multiple-punishment cases, creating areas in which arguably the Legislature cannot now act. To the extent that those decisions interpret the prohibition against double jeopardy as a substantive limitation on the Legislature, we now disavow them.

We are therefore left only with the question of what the Legislature intended in cases such as those at bar. As a means of determining that end, we find the *Blockburger* test to have questionable status in the Supreme Court of the United States and find the propriety of its use in any case to be questionable. [*Robideau* at 485-486.]

Thus, in cases involving the double jeopardy protection against double punishment, although we have not decided a case involving both successive prosecutions and multiple punishment as in *Garrett,* it is clear that we have interpreted the Michigan Constitution consistently with the United States Supreme Court's interpretation of the federal constitution—legislative intent controls. We now turn to the task of determining what the Legislature intended regarding the statutes in this case. We note, however, that the analysis is complicated by having convictions for armed robbery and assault with intent to commit murder, and it is further complicated by the felony-

firearm charges accompanying each felony. We will address each crime separately.

## a. ARMED ROBBERY

In *Robideau,* while confirming that legislative intent controls, we abandoned the *Blockburger* test, favoring the more traditional means of determining the intent of the Legislature. *Robideau* at 486. For determining legislative intent, in addition to any other indicative sources, we set forth two general principles to be considered. However, we noted that if "conclusive evidence of legislative intent [cannot] be discerned, the rule of lenity requires the conclusion that separate punishments were not intended." *Id.* at 488.

In determining legislative intent a court must identify the type of harm the Legislature was intending to prevent,[16] and the amount of punishment authorized by it.[17] Accordingly, in applying the foregoing to *Robideau,* which involved first-degree criminal sexual conduct, and the underlying felony required to establish that charge which also served as the basis for another conviction of the same felony, we held that, although the compound crime of first-degree criminal sexual

---

[16] Statutes prohibiting conduct that is violative of distinct social norms can generally be viewed as separate and amenable to permitting multiple punishments. . . . Where two statutes prohibit violations of the same social norm, albeit in a somewhat different manner, as a general principle it can be concluded that the Legislature did not intend multiple punishments. [*Id.* at 487.]

[17] We noted that the structure of many of our criminal statutes often contain an hierarchical system in which the general elements of a particular crime are enumerated in a base section, and then the punishment increases as the crime becomes more and more severe. For crimes structured in this manner the suggestion is that the Legislature did not intend to punish more than one of them in any particular circumstance.

conduct incorporates all the elements of the predicate felony when that is the method used to establish the charge, the focus of first-degree criminal sexual conduct is on penetration, which involves the violation of social norms distinct from the norms protected by the predicate felony.[18]

While discussing the severity of the punishments for the crimes at issue in *Robideau,* we noted that both first-degree criminal sexual conduct and the predicate felonies carry a maximum penalty of life imprisonment. Unlike traditional lesser included offenses, which subsume into the greater like robbery and armed robbery, the compound and predicate crimes in *Robideau* had the same penalties. We surmised that the Legislature would not have intended to have the predicate felony subsume into the compound felony because such a construction would provide no reason for having the compound felony apply in that instance. Accordingly, we held that it was not a violation of double jeopardy to convict and punish the defendants in *Robideau* for the compound crime of first-degree criminal sexual conduct and the underlying predicate felony used to sustain the compound crime.

We harmonized the result reached in *Robideau* with the result in *People v Wilder,* 411 Mich 328;

[18] The defendants were not convicted of robbery and first-degree premeditated murder. If they had been, they would have been convicted of separate offenses with different objectives arising out of the same transaction. Rather, the jury in effect found that the defendants committed robbery and second-degree murder. If they had been convicted of robbery and premeditated murder, they could, under the tests that we laid down in *Robideau* and adhere to today, be punished for each offense because each carries a separate societal objective and neither aggravates the other. On the other hand, felony murder has as its objective punishment for one who commits a murder in the course of committing a felony. The societal norm could not be more clear—felony murder is second-degree murder that has been elevated to first-degree by the fact that it was committed during the commission of a felony. The felony in this case is the robbery and it was a sine qua non of the felony murder.

308 NW2d 112 (1981), in which we held that it was a violation of the state Double Jeopardy Clause to be convicted of felony murder based on armed robbery and also to be convicted of that same armed robbery in a single prosecution context.

> This analysis is consistent with the result reached in *People v Wilder,* prohibiting dual convictions of first-degree felony murder and the predicate felony. Since felony murder is punishable by a mandatory life sentence, while the predicate felonies are punishable by no more than a term of years up to life, it may be inferred that the Legislature intended to punish a defendant only once for committing both crimes. While someone in the process of committing a predicate felony has a real disincentive to commit murder (mandatory life) even absent the threat of dual convictions, the same person, assuming the predicate felony carries an up-to-life maximum penalty, would have no such disincentive to commit criminal sexual conduct unless dual convictions are imposed. [*Robideau* at 489, n 8.]

This is the pinnacle distinction between the present case and *Robideau. Robideau* involved two crimes that carried the same possible sentence, which persuaded us that the Legislature intended to punish the crimes separately. For statutory felony murder, the punishment is mandatory imprisonment for life without parole. MCL 750.316; MSA 28.548. The prosecutor must still prove malice aforethought, but the statute serves to raise what would otherwise be second-degree murder to first-degree murder—for the sole purpose of increasing punishment. See *People v Aaron,* 409 Mich 672, 719; 229 NW2d 304 (1980). The punishment for armed robbery is life imprisonment with the possibility of parole in ten years, MCL 791.234(4); MSA 28.2304(4), or any term of years—

the same as for second-degree murder. MCL
750.529; MSA 28.797.[19]

Because statutory felony murder based on the
predicate crime of armed robbery carries with it a
greater penalty than the predicate crime, we hold
that the Legislature did not intend to impose
punishments for both crimes, even under the facts
of this case, and thus, it is a violation of the
Double Jeopardy Clauses of the United States and
Michigan Constitutions to sentence the defendants
for both crimes.

### b. ASSAULT WITH INTENT TO COMMIT MURDER

We must now address the effect of the apropos
felony murder conviction on the previous assault
with intent to commit murder conviction. The
Court of Appeals properly labeled this an issue of
first impression. It is now settled law that legisla-
tive intent determines claims of multiple punish-
ment-double jeopardy violations in either succes-
sive or single prosecutions.

Just as *Blockburger* has become a "rule of statu-
tory construction" and, in applying federal law, is
implemented only to assist in determining the
intent of the Legislature, our previous cases utiliz-
ing the factual lesser included offense analysis
should be similarly treated.[20] Although those cases
have been disavowed as far as stating the control-
ling test for double jeopardy-double punishment
cases,[21] the test is not extinct when it is helpful in

[19] The dissent suggests that the difference in punishments between
felony murder and armed robbery is a "minor distinction." Opinion of
RILEY, J., *post* at 730, n 23. We disagree.

[20] *People v Martin*, 398 Mich 303, 309; 247 NW2d 303 (1976), *People
v Stewart (On Rehearing)*, 400 Mich 540, 548; 256 NW2d 31 (1977),
*People v Jankowski*, 408 Mich 79, 86; 289 NW2d 674 (1980), and
*People v Carter*, 415 Mich 558, 584; 330 NW2d 314 (1982).

[21] *People v Wakeford*, 418 Mich 95, 110-111; 341 NW2d 68 (1983).

discerning legislative intent. See *Wilder, supra* at 359 (RYAN, J., concurring).

The rationale for why the traditional lesser included offense test should not be used in the compound-predicate crime scenario is instructive:

> [T]hat a predicate-based offense requires proof of a predicate offense does not mean that the two offenses are greater and lesser included offenses in the traditional sense. "[T]he concept of included offenses reflects a continuum of culpability." Offenses lie on the same continuum, and are therefore greater and lesser included offenses, when "the elements shared by the two offenses coincide in the harm to the societal interest to be protected." *People v Ora Jones,* 395 Mich 379, 390; 236 NW2d 461 (1975). These offenses then are tied together by logic. In contrast, predicate-based offenses and their predicates are tied together by the Legislature.
>
> In our cases that have used the lesser included offense test, the implicit assumption has been that, for committing a single criminal act, the Legislature did not intend a person to be convicted of and punished for two or more offenses lying on a single continuum of culpability. This is because each continuum comprises those offenses that serve to vindicate the same social norm. Thus, if one commits a criminal act that violates a single social norm, conviction of and punishment for a single offense would seem to vindicate the interests infringed by that act. [*Wilder* at 360-361 (RYAN, J., concurring).]

In the preceding section, we discussed the structure of some of our criminal statutes, indicating that many of them have base crimes setting forth the fundamental elements for their completion, and then increase in penalty as the crime gets more complex in elements and severe in nature. For these types of crimes, the Legislature did not

intend concurrent or subsequent prosecution, or multiple punishment.

Similarly, in the present case, the defendants were convicted of assault with intent to commit murder and then subsequently actual murder. The Court of Appeals held that assault with intent to commit murder is a lesser included offense of felony murder.[22] Had the death of Mr. Dudley occurred before the first conviction, it is without doubt that upon the finding of guilt for felony murder, the assault with intent to commit murder would have merged into the more serious crime.[23]

### III

It is clear in applying the *Robideau* analysis that had these defendants originally been prosecuted for felony murder, they could not have been sentenced both for felony murder and armed robbery, or for felony murder and the lesser included offense of assault with intent to murder. If they had been, the remedy would have been to affirm the conviction of the higher charge and to vacate the lower conviction. *People v Jankowski,* 408 Mich 79, 96; 289 NW2d 674 (1980), citing *People v Martin,* 398 Mich 303, 313; 247 NW2d 303 (1976).[24]

---

[22] We note in passing that this statement is true only if the malice aforethought to establish felony murder is "intent to kill" not the intent to inflict great bodily harm or the intent representing a depraved heart. Therefore, the Court of Appeals holding in this regard must be limited to the facts of this particular case.

[23] A defendant may be charged and tried for each act that constitutes a separate crime. However, when tried for an act which includes lesser offenses, if the jury finds guilt of the greater, the defendant may not also be convicted separately of the lesser included offense. The prohibition against multiple punishment for the same crime cannot be avoided by the form of the charge. [*People v Martin,* n 20 *supra* at 309.]

[24] The United States Supreme Court has recently faced a similar

Because the appeal before us does not include the original convictions and sentences, that remedy is possibly beyond our control in this case.[25] See *United States v Reed,* 980 F2d 1568, 1581 (CA 11, 1993). On the other hand, if we were to hold that the instant sentence for felony murder could not be imposed on these defendants, it would nullify the purpose of the constitutionally acceptable *Diaz* exception.

We conclude that double jeopardy protection dictates that defendants not receive a form of

question. *Jones v Thomas,* n 14 *supra.* In that case, when it was realized that 'a Missouri defendant was erroneously sentenced consecutively, the trial court vacated the shorter of the two sentences, giving credit for time already served.

The Court stated:

The answer turns on the interest that the Double Jeopardy Clause seeks to protect. Our cases establish that in the multiple punishments context, that interest is "limited to ensuring that the total punishment did not exceed that authorized by the legislature." The purpose is to ensure that sentencing courts do not exceed, by the device of multiple punishments, the limits prescribed by the legislative branch of government, in which lies the substantive power to define crimes and prescribe punishments.

\* \* \*

[T]he state-court remedy fully vindicated respondent's double jeopardy rights. . . . This remedy of crediting time already served against the sentence that remained in place is consistent with our approach to multiple punishments problems in other contexts. Respondent now stands convicted of felony murder alone, and his continued confinement under the single sentence imposed for that crime is not double jeopardy. [*Jones,* n 14 *supra* at 381-382. Citations omitted.]

[25] The Court of Appeals vacated and set aside the prior convictions of armed robbery and assault with intent to commit murder without providing any analysis of its authority to do so. We question whether the Court of Appeals had jurisdiction to take such action regarding a case not properly before it. The correct remedy for these errors would be an order by the trial court, which rendered the punishments for the original convictions, granting relief from judgment. MCR 6.502. Of course, in the event that such an order is entered, credit must be given for time already served. *Ohio v Johnson, supra* at 499, citing *North Carolina v Pearce, supra* at 718.

multiple punishment that could not have been
exacted had their felonious intentions been real-
ized sooner and had they been prosecuted to the
extent of their ultimate culpability in the first
trial. They were not placed in jeopardy twice by
the second prosecution under *Diaz;* rather, they
were subjected to punishment for offenses arising
out of a single transaction that could not have
been exacted in a single proceeding. Thus we
conclude that the defendants are entitled to relief
from their convictions of assault with intent to
murder and armed robbery.

IV

Before the Court of Appeals decision, the defen-
dants had been convicted and sentenced for two
counts of felony-firearm based on assault with
intent to commit murder and armed robbery. De-
fendant Bush was then convicted of a third charge
of felony-firearm based on the felony murder. De-
fendant Harding was acquitted of the subsequent
felony-firearm charge. The problem is that Bush
has been convicted of three counts of felony-
firearm based on three separate felonies, but pun-
ishment for two of those felonies violates double
jeopardy.

It has been settled by this Court that a defen-
dant can be charged, convicted, and sentenced for
felony-firearm for each felony committed in a
spree of criminal activity. *People v Morton,* 423
Mich 650; 377 NW2d 798 (1985). The corollary is:
If the substantive crime underlying a felony-
firearm conviction must be vacated, then that
accompanying felony-firearm conviction also must
be vacated. A defendant can be convicted for only

one charge of felony-firearm for each convicted felony.[26]

Felony-firearm can only attach to individual felonies.[27] In view of our holding that the felony murder conviction does not amount to a double jeopardy violation, it follows that the accompanying felony-firearm conviction is valid. It also stands to reason that the prior felony-firearm convictions are no more valid than the convictions to which they are attached. Therefore, because the previous felonies may be vacated, the felony-firearm convictions accompanying those felonies may similarly be vacated; however, consistent with our analysis above, credit for time served for one of the previous felony-firearm convictions is appropriate.

V

Defendant Harding argues for the first time that he has been denied under both the state and federal constitutions due process of law, equal protection of the laws, and the right to present a defense, because more than four years had elapsed between the assault with intent to commit murder and the actual death of Mr. Dudley.

This Court has previously abrogated the common-law "year and a day" rule, which required that in order to bring murder charges against a defendant, the victim must have died within a year and a day of the assault. *People v Stevenson,*

[26] We acknowledge that juries are permitted to be inconsistent, *People v Vaughn,* 409 Mich 463, 465-466; 295 NW2d 354 (1980); however, we have also held that appellate courts may not. *People v Burgess,* 419 Mich 305, 311; 353 NW2d 444 (1984).

[27] The Court of Appeals discussed this issue in terms of "one wrongful act." We think the use of the term "wrongful act" in this context improperly connotes the application of the "same transaction" or "same conduct" test, which does not apply here because felony-firearm attaches to individual felonies not transactions or episodes of conduct. 187 Mich App 316, 329; 466 NW2d 736 (1991).

416 Mich 383; 331 NW2d 143 (1982).[28] In so holding
we were warned of the potential for abuse of other
important rights like speedy trial, cruel and unu-
sual punishment, and double jeopardy; however, in
reassuring the appellee in that case we stated:

Recognizing that such rights may be implicated
in long-delayed prosecutions, we will continue to
be vigilant in the enforcement of those rights
where they are shown to have been abridged or
denied under the facts of a particular case. [Ste-
venson at 393, n 3.]

As in Stevenson, we have been called upon
many times to exercise our authority to modify the
common law when changes in public policy or
technology so dictate. See Stevenson at 390 for a
list of cases.[29] This case continues where Stevenson
left off, because now we are presented with the
situation in which a victim, although injured, had
resumed a somewhat "normal" life and possibly

[28] The advances of modern medical science, by extending life
and by providing strong evidence of the cause of death, have
undermined the wisdom of the irrebuttable presumption that
the death of one who expires more than a year and a day after
receiving an injury was not caused by the injury. The availabil-
ity of modern life-sustaining equipment and procedures, see In
re Quinlan, 70 NJ 10; 355 A2d 647 (1976), raises the specter of
the choice between terminating life-support systems or allowing
the defendant to escape a murder charge. The presumption was
wooden and arbitrary from the beginning, since it prevented a
murder conviction even in those rare cases when causation
could be proved. Now, when medical causation can be proven
with much greater frequency and certainty, the old rule is
simply too often demonstrably wrong to be upheld. [Id. at 392.]

[29] We acknowledge our plurality opinion in People v Couch, 436
Mich 414; 461 NW2d 683 (1990), questioning our authority to change
the common law to expand the scope of a defendant's criminal
liability; however, in this case we are asked to create a prophylactic
remedy to narrow the breadth of criminal liability, and any reserva-
tion we had in Couch certainly would not apply here.

would have lived longer had he followed the instructions of his doctor.[30]

In making the catchall constitutional pleas, Mr. Harding is basically arguing for fairness, and although those pleas are without merit,[31] he also urges us to consider adopting a languishing factor to be part of the crime to be proven by the prosecution or as a legal question to be decided by the court.

We resisted establishing such a test in *Stevenson* with the foresight that the causation inquiry would continue to be the screen through which the questionable cases would be filtered out.

> Of course, abolition of the rule would not relieve the prosecution of its duty to prove all of the elements of the crime, including proximate causation, beyond a reasonable doubt. A murder conviction which rests upon uncertain medical speculation as to the cause of death is not a case which has been proved beyond a reasonable doubt. Fears about murder convictions for death 5, 10, or even 20 years after the injury are therefore unfounded where proximate cause is proven beyond a reasonable doubt. If such proof is available, the conviction is justified. No repose or statute of limitations

---

[30] See n 4.

[31] The due process argument fails under the authority of *Stevenson,* and the equal protection argument does not pass the two-pronged test set forth in *People v Ford,* 417 Mich 66, 102; 331 NW2d 878 (1982). As far as the right to present a defense is concerned, we view this as a restatement of the insufficient evidence argument, which we addressed in n 5.

Defendant Harding also makes an ex post facto argument that *Stevenson* should not apply in his case and that he falls within the protection of the year and a day rule because *Stevenson* was decided only four months and two weeks before the assault in the present case, and because the decision was not even published in a bound volume until 1984, "[s]urely Defendant is only held to knowledge of the law by the date on which he would have had the *opportunity* to read it." *Stevenson* was given prospective effect from the date the decision was issued. Never have we held, nor does Mr. Harding cite any state case that has held, that a decision was to have prospective effect from the date it was placed in a bound volume.

is available for murder in this state. MCL 767.24;
MSA 28.964. [*Stevenson* at 392-393.]

Similarly, the defendant does not cite, nor have
we been able to discover, any state that has insti-
tuted a languishing test, which would require the
determination whether a victim was languishing
from a felonious injury at the time of death.
However, while we do not wish to preclude such a
test, even if this issue were presented, briefed, and
argued in the Court of Appeals and, thus, properly
before us, we think the injuries were of such a
lingering nature and the testimony regarding the
ongoing complications so explicitly clear that it
would be nearly impossible to avoid finding that
Jeffrey Dudley continued to languish from the
felonious injuries until his death, and a judge or a
jury would be well within its bounds to so find. See
n 4.

VI

We conclude that the defendants are entitled to
have their assault with intent to murder and
armed robbery convictions vacated along with the
corresponding felony-firearm convictions. It is fur-
ther ordered that defendants are entitled to re-
ceive sentence credit toward their statutory felony-
murder punishment for the time served for the
assault with intent to murder and armed robbery
convictions, and defendant Bush is to receive sen-
tence credit toward his subsequent felony-firearm
conviction for time served for his previous felony-
firearm convictions.[32]

[32] We recognize that given the fact that the defendants are serving
sentences of life without parole for their felony murder convictions,
sentencing credit may seem a hollow victory. Nevertheless, because of
the ever-present possibility of future appeals or executive clemency,
we continue our practice of stating for the record the status of
individual offenses and their punishments.

The Court of Appeals order vacating the convictions of assault with intent to commit murder and armed robbery is reversed; its order vacating the felony-firearm conviction arising out of the case before us also is reversed. The Court of Appeals is affirmed with respect to its holding on the statutory felony-murder conviction.

Affirmed in part and reversed in part.

GRIFFIN and MALLETT, JJ., concurred with BRICKLEY, J.

RILEY, J. (*concurring in part and dissenting in part*). I concur with the findings in §§ I, II(A), and V and join those holdings.[1] However, I write separately because I find that the Double Jeopardy Clause does not prohibit the conviction of and sentencing for both felony murder and armed robbery in the instant case.

I

The Fifth Amendment of the United States Constitution provides that "[n]o person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb . . . ."[2] Similarly, art 1, § 15 of the Michigan Constitution declares that "[n]o person shall be subject for the same offense to be twice put in jeopardy."[3] The majority finds that these constitutional guarantees bar the conviction of defendants of both felony murder and the underlying crime of armed robbery. *Ante* at 714-716.

---

[1] Furthermore, I concur with §§ III and IV where they do not conflict with my separate opinion.

[2] The Double Jeopardy Clause is applicable to the states through the Fourteenth Amendment. *Benton v Maryland,* 395 US 784; 89 S Ct 2056; 23 L Ed 2d 707 (1969).

[3] Michigan has also codified the guarantee against double jeopardy. MCL 768.33; MSA 28.1056.

A

This Court has long held that a constitution must be interpreted as understood by its ratifiers. *Lockwood v Comm'r of Revenue,* 357 Mich 517, 555; 98 NW2d 753 (1959). As Justice COOLEY noted, reference to history is often necessary to ensure that the intentions of the ratifiers and framers is adhered to, especially when construing legal doctrines inherited from "the great charters of English liberty, whose provisions declaratory of the rights of the subject have acquired a well-understood meaning, which the people must be supposed to have had in view of adopting them." 1 Cooley, Constitutional Limitations (8th ed), p 132.[4] Indeed, "[w]e cannot understand these provisions unless we understand their history; and when we find them expressed in technical words, and words of art, we must suppose these words to be employed in their technical sense." *Id.* at 132.[5] Hence, this Court has long focused particular attention on the historical understanding of the prohibition of double jeopardy when construing its protections.[6]

1

The doctrine of double jeopardy "is older than

[4] See *Committee for Constitutional Reform v Secretary of State,* 425 Mich 336, 342; 389 NW2d 430 (1986); *Traverse City School Dist v Attorney General,* 384 Mich 390, 405; 185 NW2d 9 (1971); *John Hancock Mutual Life Ins Co v Ford Motor Co,* 322 Mich 209, 222; 33 NW2d 763 (1948); *Pfeiffer v Detroit Bd of Ed,* 118 Mich 560, 564; 77 NW 250 (1898); *People v Blodgett,* 13 Mich 127, 142 (1865) (opinion of CAMPBELL, J.).

[5] Without such an examination, the constitution may be "made to express purposes which were never within the minds of the people agreeing to it," *People v Harding,* 53 Mich 481, 485; 19 NW 155 (1884), and may "make the constitutional safeguard no more than a shabby hoax, a barrier of words, easily destroyed by other words." *Lockwood, supra* at 556.

[6] See, e.g., *People v Harding,* n 5 *supra* at 485; *People v Thompson,* 424 Mich 118, 125-126; 379 NW2d 49 (1985).

.our constitutions." *Village of Northville v West-fall,* 75 Mich 603, 608; 42 NW 1068 (1889). In fact, the maxim that no person should be placed at jeopardy more than once for a single criminal offense is rooted in the very origins of western civilization.[7] "By the thirteenth century it seems to have been firmly established in England, where it came to be considered as a 'universal maxim of the common law.'" *Bartkus v Illinois (On Rehearing),* 359 US 121, 152-153; 79 S Ct 676; 3 L Ed 2d 684 (1959) (Black, J., dissenting) (citations omitted).[8]

Thus, upon the settling of America, the colonists understood the prohibition of double jeopardy as a fundamental principle of law. Accordingly, the founding fathers embedded the ancient palladium in the constitution.[9] The Fifth Amendment encom-

---

[7] For an extensive analysis of the ancient origins of the prohibition of double jeopardy and its development over the ages, see *United States v Wilson,* 420 US 332, 339-340; 95 S Ct 1013; 43 L Ed 2d 232 (1975); *Bartkus v Illinois (On Rehearing),* 359 US 121, 151-154; 79 S Ct 676; 3 L Ed 2d 684 (1959) (Black, J., dissenting); *United States v Jenkins,* 490 F2d 868, 870-874 (CA 2, 1973), aff'd 420 US 358; 95 S Ct 1006; 43 L Ed 2d 250 (1975).

[8] Underlying this prohibition against double jeopardy has been the principle that "the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty." *Green v United States,* 355 US 184, 187-188; 78 S Ct 221; 2 L Ed 2d 199 (1957).

[9] James Madison authored a prohibition of double jeopardy in the draft Bill of Rights he presented to the House of Representatives during its first session in 1789. Madison's draft of the Fifth Amendment introduced to the House of Representatives on June 8, 1789, in part declared: "'No person shall be subject, except in cases of impeachment, to more than one punishment or one trial for the same offence.' 1 Annals of Congress 434." Representative Benson, of New York, however, argued that the clause's meaning was "'rather doubtful.'" Benson stated that the clause should clearly be "'intended to convey what was formerly the law, that no man's life should be more than once put in jeopardy for the same offense.' 1 Annals of Congress 753 (August 17, 1789)." The Senate concurred and altered the language to include the traditional and well-defined term of "jeopardy" to ensure the common-law protections were secure. *Jenkins, supra,* 490 F2d 873.

passed the technical concepts of the common law and was adopted by Congress. That the framers and ratifiers of the Bill of Rights intended to constitutionalize the common law's protection against double jeopardy is unquestioned.

Because the ancient right to be free from former jeopardy included not only protection from retrial upon the same offense after an acquittal or conviction, but also prohibition of "a second punishment for the same offence," *Ex parte Lange,* 85 US (18 Wall) 163, 169; 21 L Ed 872 (1873),[10] the Fifth Amendment as well "was designed as much to prevent the criminal from being twice punished for the same offence as from being twice tried for it." *Id.* at 173.[11]

---

[10] The United States Supreme Court has explained:

> If there is anything settled in the jurisprudence of England and America, it is that no man can be twice lawfully punished for the same offence. And though there have been nice questions in the application of this rule to cases in which the act charged was such as to come within the definition of more than one statutory offence, or to bring the party within the jurisdiction of more than one court, there has never been any doubt of its entire and complete protection of the party when a second punishment is proposed in the same court, on the same facts, for the same statutory offence. [*Ex parte Lange, supra* at 168.]

See also notes and comments, *Twice in Jeopardy,* 75 Yale L J 262, 266, n 13 (1965) ("preventing multiple punishment for the same offense was foremost in the minds of the framers of the double jeopardy clause"). Contra *Whalen v United States,* 445 US 684, 702; 100 S Ct 1432; 63 L Ed 2d 715 (1980) (Rehnquist, J.) ("if the only question confronting this Court is whether Congress intended to authorize cumulative punishments for rape and for felony murder based upon rape, this Court need decide no constitutional question whatsoever").

[11] Indeed, Madison's original draft of the Double Jeopardy Clause explicitly prohibited multiple punishment, but was altered to ensure that the common law meaning of the doctrine was placed into the constitution. See n 9. Congressman Benson remarked that the Fifth Amendment was intended " 'to prevent more than one punishment.' " Yale L J, n 10 *supra* at 266, n 12, quoting 1 Annals of Congress 433 (June 8, 1789).

Upon its founding, the people of Michigan also incorporated the ancient common-law prohibition of double jeopardy into their constitution. Const 1835, art 1, § 12.[12] See also *People v Harding,* 53 Mich 481, 485-487; 19 NW 155 (1884); *People v Fochtman,* 226 Mich 53, 56; 197 NW 166 (1924). Although the language of this protection in our fundamental charters has altered with the passage of time,[13] this Court has uniformly held that the Michigan Constitution was intended by its ratifiers and framers to embody those principles derived from the English common law, and, therefore, is also consistent with the Fifth Amendment of the United States Constitution.[14] See, e.g., *In re Ascher,* 130 Mich 540, 545; 90 NW 418 (1902); *People v Fochtman, supra* at 56. To clarify its meaning and to ensure its continued protection of the ancient right, the Constitutional Convention of 1961 modified the language of the Double Jeopardy Clause to conform more closely with the language of the historic English common law and the Fifth Amendment, as well as the practice of

[12] No person for the same offence, shall be twice put in jeopardy . . . .

[13] The constitution of 1835 declared that "[n]o person, for the same offence, shall be twice put in jeopardy." The constitutions of 1850 and 1908, however, proclaimed that "[n]o person after acquittal upon the merits shall be tried for the same offense." Const 1850, art 6, § 29; Const 1908, art 2, § 14. For an explanation of these changes, see n 10.

[14] However, the Michigan provision enlarges the protections of the criminal defendant. At common law, a defendant could be acquitted on the merits, but be subject to a second trial if for any reason, the original complaint was not insufficient to support a judgment. *Harding, supra* at 486. Determining that such a result was unjust, Michigan adopted a constitutional provision that prohibited such a retrial; hence the alteration of the constitutional language in 1850. *Id.* See n 11. No other expansion of the common law, however, was intended by the Michigan Constitution. *Id.* at 486-487.

this Court.[15] Hence, art 1, § 15 now declares that "[n]o person shall be subject for the same offense to be twice put in jeopardy." In the instant case, therefore, the application of the Michigan and federal constitutions are uniform because both are based upon the ancient English common-law prohibition of double jeopardy.[16]

---

[15] The address to the people explained that "[t]he new language . . . involves the substitution of the double jeopardy provision from the U. S. Constitution in place of the present provision which merely prohibits 'acquittal on the merits.' This is more consistent with the actual practice of the courts in Michigan." 2 Official Record, Constitutional Convention 1961, p 3364.

That the framers of the constitution intended no substantive alteration in its protection against double jeopardy was consistently reaffirmed at the convention. See, Delegate Judge Pugsley, 1 Official Record, Constitutional Convention 1961, p 541 ("this amendment which has been offered here to the original language of the section has been made to comply with the rulings which have been made by our supreme court on the matter of jeopardy"); Delegate Danhof, 1 Official Record, Constitutional Convention 1961, p 542 (that language alteration "would be changing nothing substantive in the law because the words 'trial upon the merits' have not, by court interpretation, meant the completion to acquittal").

For a thorough examination of the purpose behind this technical alteration of the Double Jeopardy Clause, see *Thompson,* n 6 *supra.*

[16] Although this Court has stated that the protections afforded by the state and federal prohibitions against double jeopardy are identical, see, e.g., *People v Schepps,* 231 Mich 260, 265; 203 NW 882 (1925); *People v Powers,* 272 Mich 303, 307; 261 NW 543 (1935), the Court did not intend and could not deprive the state constitution of independent vitality. This is true simply from the structure of our constitutional system. Our state constitution continues to possess vitality independent of the federal constitution. For instance, if the United States Supreme Court disavowed incorporation of the Fifth Amendment's Double Jeopardy Clause by reversing *Benton, supra,* the protection of the Michigan provision would necessarily still possess force. Similarly, if the United States Supreme Court were to falter and deviate from the ancient common-law understanding of the prohibition of double jeopardy (for instance, by permitting retrials for the same offense after acquittal), this Court would not be empowered to impose that novel interpretation upon our constitution. On the other hand, when the United States Supreme Court does adhere to the original common-law understanding of the prohibition against double jeopardy, this Court must adhere to that understanding—not simply because the United States Supreme Court so holds, but because our constitution is founded on the same principles as the Fifth Amendment. In other words, the starting point for Michigan constitutional jurisprudence is the original understanding of the document's ratifiers and

II

A

Because it was designed originally to embody the protection of the common-law pleas of former jeopardy, see *United States v Wilson,* 420 US 332, 339-340 (1975), the Fifth Amendment double jeopardy guarantee serves principally as a restraint on courts and prosecutors. The legislature remains free under the Double Jeopardy Clause to define crimes and fix punishments; but once the legislature has acted courts may not impose more than one punishment for the same offense and prosecutors ordinarily may not attempt to secure that punishment in more than one trial. [*Brown v Ohio,* 432 US 161, 165; 97 S Ct 2221; 53 L Ed 2d 187 (1977), quoted in *Wayne Co Prosecutor v Recorder's Court Judge,* 406 Mich 374, 391-392; 280 NW2d 793 (1979).]

With regard to multiple punishment, "the role of the constitutional guarantee is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments

framers, supplemented by history, not the decisions of federal courts regarding analogous provisions. Often parallel constitutional provisions will be interpreted in the same manner, but only because both provisions were enacted with the same protections intended.

Thus, although not directly at issue, this Court's prior holding in *People v White,* 390 Mich 245; 212 NW2d 222 (1973), should be reëxamined. In *White,* this Court adopted the transactional approach posited by Justice Brennan in his concurring opinion in *Ashe v Swenson,* 397 US 436, 448; 90 S Ct 1189; 25 L Ed 2d 469 (1970), to determine whether a second prosecution violates the Michigan Constitution's prohibition against double jeopardy. Yet, the original understanding of the doctrine of double jeopardy rejects this interpretation. *United States v Dixon,* 509 US —; 113 S Ct 2849, 2860; 125 L Ed 2d 556 (1993) (holding that the same conduct test "is wholly inconsistent with . . . the clear common-law understanding of double jeopardy," and accepting as dispositive Justice Scalia's dissenting opinion in *Grady v Corbin,* 495 US 508; 110 S Ct 2084; 109 L Ed 2d 548 [1990]); *id.* at 529-536 (Scalia, J.) (finding that the English common law and early American jurisprudence reject any transactional or same conduct test, and accepting *Blockburger v United States,* 284 US 299, 304; 52 S Ct 180; 76 L Ed 306 [1932], as the correct analysis).

for the same offense." *Brown, supra* at 165.[17]
"Thus, the question of what punishments are constitutionally permissible is not different from the question of what punishments the Legislative Branch intended to be imposed." *Albernaz v United States,* 450 US 333, 344; 101 S Ct 1137; 67 L Ed 2d 275 (1981).

Hence, in the instant case, "[t]he dispositive question is whether the Legislature intended that two convictions might result . . . under the circumstances presented in this case." *People v Wakeford,* 418 Mich 95, 111; 341 NW2d 68 (1983).[18] "Thus, '[e]ven if the crimes are the same, . . . if it is evident that a state legislature intended to authorize cumulative punishments, a court's inquiry is at an end' . . . ." *People v Sturgis,* 427 Mich 392, 400; 397 NW2d 783 (1986), quoting *Ohio v Johnson,* 467 US 493, 499, n 8; 104 S Ct 2536; 81 L Ed 2d 425 (1984).[19] Such adherence to legislative intent is necessary because "[i]n our effort to see that the rights of persons accused of crime are protected, we should not overlook the fact that the

[17] Furthermore, multiple punishment may violate the doctrine of separation of powers by exceeding judicial authority to impose punishment, *Whalen, supra* at 689, n 4, or due process because a court may not deprive person of liberty "except to the extent authorized by state law." *Id.* Contra, *id.* at 701-703 (Rehnquist, J.) (finding that a court only exceeds its statutory authority, not the constitution, by imposing multiple punishment).

[18] [D]efendant's claim of factual double jeopardy depends not upon whether most or all of the same evidence was utilized to convict of both [offenses], but whether the legislative intent or statutory purpose was that two convictions should result. To the extent certain language in [previous cases] suggests that the critical test is whether the defendant committed "one single wrongful act," we specifically disavow that test. It is up to the Legislature, not this Court, to determine what constitutes a single offense. The so-called "factual double jeopardy" doctrine simply asks whether the Legislature authorized multiple punishment under the circumstances. [*Id.* at 110-111.]

[19] See also *People v Robideau,* 419 Mich 458, 486; 355 NW2d 592 (1984).

people also have interests that should be safe-guarded." *In re Ascher, supra* at 551.[20]

B

In the instant case, the Legislature intended to punish defendant for both felony murder and armed robbery. As explained by the majority, the intent of the Michigan Legislature may be determined through traditional means, including "the subject, language, and history of the statutes." *People v Robideau,* 419 Mich 458, 486; 355 NW2d 592 (1984).[21] Citing *Robideau,*[22] the majority con-

[20] Moreover, "the core double jeopardy right to be free from vexatious proceedings is simply not present . . . ." *Sturgis, supra* at 400.

[21] Although the United States Supreme Court utilizes the test articulated in *Blockburger,* n 16 *supra* at 304, to determine the legislative intent of Congress, *Dixon,* n 16 *supra,* this Court has rejected that method of statutory interpretation for more traditional methods when interpreting Michigan legislation. *Sturgis, supra* at 404-405 ("[t]his Court has now clearly rejected . . . the 'wooden application' of *Blockburger,* in favor of the more flexible, and traditional means of determining the intent of the Legislature"); *People v Whiteside,* 437 Mich 188, 200; 468 NW2d 504 (1991). That the tests utilized by this Court and the United States Supreme Court regarding the finding of the legislative intent of their respective legislatures differ does not result in a clash of constitutional analysis, but simply a recognition that separate jurisdictions may utilize independent modes of statutory construction. Adherence to the ancient common-law concept of double jeopardy is not endangered by such conflicts, as long as both jurisdictions recognize that, in the multiple punishment context, their duty is simply to discern whether the Legislature intended the punishment at issue.

[22] In *Robideau,* the Court held that when a defendant is convicted of both armed robbery and felony murder arising from the same series of events, the robbery conviction must be vacated. Noting that the felony murder conviction was punishable by a mandatory life sentence, while the predicate crime was only punishable by a term of years to life, the Court inferred "that the Legislature intended to punish a defendant only once for committing both crimes." *Robideau, supra* at 489, n 8.

On the other hand, the Court ruled that equal punishments intend multiple punishment:

[F]irst-degree criminal sexual conduct and those predicate crimes which normally occur along with first-degree criminal

cludes that because the armed robbery statute permits punishment ranging from any term of years to life, while felony murder is mandatory life imprisonment, the Legislature intended punishment for felony murder subsume punishment for armed robbery. The majority, however, incorrectly dismisses the maximum punishment authorized for armed robbery: life imprisonment.[23] Utilizing its own analysis, the majority should find that the Legislature intended separate punishment for each offense at issue because each may be punished by life imprisonment.[24]

---

sexual conduct, including armed robbery and kidnapping, have equal punishments. If the predicate crime is considered subsumed, there is no greater punishment. To suggest that the Legislature intended first-degree criminal sexual conduct to subsume a co-equal felony would be to attribute to the Legislature a total lack of purpose. [*Robideau, supra* at 489.]

[23] While the punishment for felony murder is life imprisonment without the possibility of parole, MCL 750.316; MSA 28.548, and the life term for armed robbery is with the possibility of parole, MCL 791.234; MSA 28.2304, the suggestion that this minor distinction clearly reveals a legislative intent to subsume the punishment for armed robbery into the punishment for felony murder is doubtful because a felon convicted of armed robbery could very well serve a full life sentence. This is especially true when the societal interests of each offense are disparate.

[24] Furthermore, "[l]egislative intent may also be gleaned from the overall statutory scheme." *People v Campbell,* 165 Mich App 1, 5; 418 NW2d 404 (1987).

The language of statutes sometimes indicates a legislative intent to create a series of offenses prohibiting different phases of conduct, with a separate penalty for each. On the other hand, the legislative intent may sometimes appear from language creating a hierarchy of offenses, depending on the presence or observance of certain aggravating factors. The former structure is indicative of legislative intent to create separate offenses, separately punishable. The latter structure may indicate an intention to permit only a single appropriate offense and conviction. [*Sturgis, supra* at 407.]

However, as noted by Justice RYAN, the offense of felony is not placed neatly in either category because it does not " 'reflect[ ] a continuum of culpability,' " which is ".tied together by logic." *People v*

Moreover, this Court has also noted that when statutes are directed at "distinct social purposes" or "distinct evils" multiple punishment was intended by the Legislature. *Sturgis, supra* at 408, 409. An examination of the elements of the offenses reveal that the social interests in punishing armed robbery are distinct from punishing first-degree murder. The elements of first-degree murder include: (1) malice, (2) homicide, and (3) either premeditation or a homicide accompanied by an enumerated felony. MCL 750.316; MSA 28.548. In other words, first-degree murder is common-law murder " 'plus one or more of the aggravating circumstances mentioned' . . . ." *People v Carter,* 395 Mich 434, 438; 236 NW2d 500 (1975), quoting Perkins, Criminal Law (2d ed), p 90. Hence, the focus of the offense is murder.[25]

On the other hand, the elements of armed robbery include: (1) an assault, (2) a felonious taking of property from the victim's presence or person, and (3) a perpetrator armed with a weapon. MCL 750.529; MSA 28.797. In other words, "[r]obbery is committed only when there is larceny from the person, with the additional element of violence or intimidation." *People v Chamblis,* 395 Mich 408, 425; 236 NW2d 473 (1975).[26] Hence, the offense "is

*Wilder,* 411 Mich 328, 360; 308 NW2d 112 (1981). Instead, predicate offenses in the felony murder context "are tied together by the Legislature." *Id.* The unique structure of the felony murder statute, therefore, only ambiguously reflects the intent of the Legislature with regard to the multiple punishment issue.

[25] In a charge of felony murder, it is the murder which is the harm which is being punished. [*People v Aaron,* 409 Mich 672, 728; 299 NW2d 304 (1980).]

[26] See also *People v Jankowski,* 408 Mich 79, 87; 289 NW2d 674 (1980), quoting *People v Kelley,* 21 Mich App 612, 619; 176 NW2d 435 (1970) ("[r]obbery has long been defined in this jurisdiction to be nothing more than a 'larceny committed by assault or putting in fear' "); *Wakeford, supra* at 126-129 (opinion of LEVIN, J.); *Campbell,* n 24 *supra* at 6. But see *Wakeford, supra* at 111 ("[t]he primary purpose of the statute [armed robbery] is the protection of persons").

aimed at persons who violate social norms by taking property from the presence of another by force or threat of force while armed with a weapon." *People v Witt,* 140 Mich App 365, 371; 364 NW2d 692 (1985).

Thus, first-degree murder focuses upon homicide, armed robbery upon the violent deprivation of property. The first-degree murder statute does not punish the taking of property except when accompanied by a homicide. Nor does the armed robbery statute punish homicide. The societal interests are independent. In fact, the societal interests targeted by the felony murder provision of the first-degree murder statute generally are distinct from the underlying felonies. Felony murder is designed to punish homicide committed in the course of aggravated circumstances, while the societal interests undergirding the enumerated felonies are independent and also important to maintain. That the societal interests in prohibiting rape and kidnapping, for instance, are distinct from those prohibiting murder cannot be doubted. In a parallel fashion, the societal interests served by armed robbery and the first-degree murder statutes are distinct.[27]

This is especially true in Michigan where felony murder requires malice. *People v Aaron,* 409 Mich 672, 728; 299 NW2d 304 (1980). The societal interest in prohibiting first-degree murder is not only homicide, but one committed with malice. *Id.* Armed robbery, of course, does not possess such a requirement. "[T]he presence of the different intent elements indicates that the Legislature intended to prevent distinct types of harm, robbery

---

[27] The statute proscribing the underlying felony—robbery, for example—is designed to protect a wholly different societal interest from the felony murder statute, which is intended to protect against homicide. [*United States v Greene,* 160 US App DC 21, 44; 489 F2d 1145 (1973) (Bazelon, C.J., dissenting).]

and corporal harm," as well as intended to address separate social ills. *People v Smith*, 152 Mich App 756, 761; 394 NW2d 94 (1986) (holding that multiple punishments were intended with regard to assault with intent to do great bodily harm and assault with intent to rob and steal while armed). See also *People v Leach*, 114 Mich App 732, 735-736; 319 NW2d 652 (1982) (holding that multiple punishments were intended with regard to armed robbery and assault with intent to commit great bodily harm). The Legislature carefully crafted distinct offenses defending separate societal interests that defendants violated. Punishment for each offense was intended by the Legislature.[28]

Moreover, in *Wakeford, supra* at 105, n 7, this Court recognized the impropriety of the majority's conclusion:

> We have never held, as a matter of state or

[28] "[I]t strains credulity to hold that the underlying felony merges into the felony murder." *United States v Greene*, n 27 *supra* at 44 (Bazelon, C.J., dissenting). Cf. *Sturgis, supra* at 409 (different social policies furthered by the felony-firearm statute and the concealed weapon statute mandate multiple punishments); *People v Guiles*, 199 Mich App 54, 59-60; 500 NW2d 757 (1993) (punishment for both felony-firearm and intentionally discharging a firearm at a dwelling or occupied structure was intended); *People v Vandelinder*, 192 Mich App 447, 453; 481 NW2d 787 (1992) (multiple punishments for solicitation to commit three different felonies within one criminal scheme were intended); *People v Kaczorowski*, 190 Mich App 165, 170-172; 475 NW2d 861 (1991) (multiple punishments for both forgery and uttering and publishing were intended); *People v Crawford*, 187 Mich App 344, 349; 467 NW2d 818 (1991) (although offenses of operating a vehicle while under the influence of an intoxicating liquor and felonious driving as a result of the same incident are directed at the same harm, the Legislature intended multiple punishments); *People v Burgess*, 153 Mich App 715, 731-735; 396 NW2d 814 (1986) (multiple punishments for first-degree murder, conspiracy to commit the murder, and inciting, inducing, or exhorting another to commit the murder intended); *Witt, supra* at 371 (armed robbery and vault robbery serve different societal interests, hence multiple punishments are valid); *People v Cousins*, 139 Mich App 583, 596; 363 NW2d 285 (1984) (multiple punishments for both assault with intent to murder and escape from jail were intended).

Because the legislative intent is sufficiently clear, the rule of lenity is not implicated.

federal constitutional law, that only one conviction may result, for example, from the rape, robbery, kidnapping, and murder of victim A . . . even if the charges must be brought in a single trial under the "same transaction" test. Such a rule could be said to permit criminals to engage in an extended crime "spree," knowing that at most only one conviction could result and that any crime other than the most serious was "free" of any possibility of conviction. It would offend rationality, as well as our sense of equal justice, to require treatment of one defendant committing a single crime identically with another defendant committing four counts of the same crime in the "same transaction."

Indeed, the majority's dismissal of the armed robbery conviction in the instant case presents the exact danger of which the Court forewarned in *Wakeford.* Accordingly, the Court of Appeals decision vacating the armed robbery conviction should be reversed.[29]

Boyle, J. (*concurring*). I concur in parts I, II(A), and v of Justice Brickley's opinion and in parts II(A) and II(B) of Justice Riley's opinion. I write separately to express my concern regarding the unsettling potential of an open-ended definition of proximate cause in which assaults may become murders years after the initial incident upon the factfinders' determination that death was the "natural" result of the original act.

I agree that these cases do not present an appropriate vehicle to consider whether, and when, a higher burden of proof of causation should be imposed in cases of long delayed death. See, e.g.,

[29] Because a defendant may be convicted for felony-firearm for each felony committed in a spree of criminal activity, *People v Morton,* 423 Mich 650; 377 NW2d 798 (1985), defendant Bush may be convicted of two felony-firearm violations—one accompanying the armed robbery and one accompanying felony murder.

*People v Stevenson,* 416 Mich 383, 393, n 4; 331 NW2d 143 (1982). Both defendants clearly intended exactly the result that occurred. The intent was to inflict a fatal wound that would have caused death, and eventually did, and "contributory negligence of the person harmed is not a defense to a criminal prosecution." Perkins & Boyce, Criminal Law (3d ed), p 781, n 74.

Nevertheless, the astonishing advancements of medical science, both in prolonging life and in identifying contributing causes of death, may suggest that in another context the question of causation, in fact and in law, should be measured by a different calculus.

The complexity of the question counsels judicious use by the prosecutor of the charging discretion approved by the Court today.

CAVANAGH, C.J. (*concurring in part and dissenting in part*). I concur with the majority's conclusion that neither the United States nor the Michigan Constitution barred the subsequent prosecutions of the defendants.[1] Furthermore, I agree that upon a proper conviction, the double jeopardy clause would compel vacating the defendants' convictions arising from the first trial.[2] I write separately, however, because I would hold that the prosecutor failed to present sufficient evidence to prove beyond a reasonable doubt that the defendants proximately caused the victim's death.

I

At the close of the state's proofs, both defendants unsuccessfully moved for a directed verdict. In the Court of Appeals, defendant Harding

[1] *Ante,* part II(A).

[2] *Ante,* parts II(B), III and IV.

claimed that his conviction for felony murder was
against the great weight of the evidence. The
Court of Appeals denied appellate review of this
issue because Harding failed to preserve the issue
by moving for a new trial.[3] The Court of Appeals,
nevertheless, addressed whether the prosecution
presented sufficient evidence to sustain the convic-
tion, and concluded that the prosecution fulfilled
its burden. 187 Mich App 316, 329-330; 466 NW2d
736 (1991). On appeal to this Court, Harding chal-
lenges the Court of Appeals determination.

A

This Court announced the standard for deter-
mining whether the prosecution has introduced
sufficient evidence to avoid a directed verdict in
*People v Hampton,* 407 Mich 354, 368; 285 NW2d
284 (1979):

> [T]he trial judge when ruling on a motion for a
> directed verdict of acquittal must consider the
> evidence presented by the prosecution up to the
> time the motion is made, view that evidence in a
> light most favorable to the prosecution, and deter-
> mine whether a rational trier of fact could have
> found *that the essential elements of the crime*
> *were proven beyond a reasonable doubt.* [Emphasis
> added, citations omitted.]

When the Court disposed of the common-law
year-and-a-day rule, it specifically noted that abro-
gation of the rule did not diminish the prosecutor's
burden.

Of course, abolition of the rule would not relieve

---

[3] See *People v Powers,* 272 Mich 303, 310; 261 NW 543 (1935).

the prosecution of its duty to prove all of the elements of the crime, including proximate causation, beyond a reasonable doubt. A murder conviction which rests upon uncertain medical speculation as to the cause of death is not a case which has been proved beyond a reasonable doubt. *Fears about murder convictions for death 5, 10 or even 20 years after the injury are therefore unfounded where proximate cause is proven beyond a reasonable doubt.* If such proof is available, the conviction is justified. [*People v Stevenson,* 416 Mich 383, 392-393; 331 NW2d 143 (1982).]

In order to secure a felony murder conviction, the state must prove, beyond a reasonable doubt, that the defendants' acts proximately caused the victim's death. Obviously, if Mr. Dudley would have died in the sewer or later at the hospital, proximate or legal causation would not present a problem. However, the case at bar is problematic because almost four and one-half years had passed between the assault and the victim's death. During this time Mr. Dudley returned to steady employment, married, fathered a child, and resumed a seminormal life. Furthermore, Mr. Dudley's death followed his participation in ninety minutes of strenuous physical activity and a physical altercation, activities which Mr. Dudley knew were forbidden. The relevant question is whether any of these events constitute a superseding cause that negates proximate cause.

The proximate cause standard requires a sufficient causal connection between the defendant's conduct and the result of that conduct. "[I]t [must] appear[ ] that the death resulted as the natural, direct, and necessary result of the unlawful act . . . ." *People v Barnes,* 182 Mich 179, 196;

148 NW 400 (1914). See also LaFave & Scott, Criminal Law (2d ed), § 3.12, p 279. As evidenced by our criminal jury instructions,[4] the criminal standard for proximate cause requires a more direct causal connection than the tort concept of proximate cause. A more demanding standard is warranted because the potential deprivation of personal rights is obviously much more extreme in criminal, as opposed to tort, actions.[5]

---

[4] Following CJI 16:1:01 and CJI 16:1:04, Judge Kuhn instructed the juries regarding the criminal standard for proximate cause:

> In order to find that the death was caused by the defendant, you must find beyond a reasonable doubt that the death of the decedent was the natural or necessary result of the act of the defendant.
> Unlike civil cases, it is not enough that the defendant's act made it possible for death to occur.
> There may be more than one cause of death. Before a person can be found guilty of having caused a death, the evidence must convince you beyond a reasonable doubt that the death of the decedent was the natural or necessary result of the act of the defendant.
> You must consider any negligence on the part of the deceased in determining whether the defendant was at all responsible.

The more demanding standard is likewise evidenced by the Michigan Criminal Jury Instructions, 2d ed. See CJI2d 16.15.

[5] The criminal standard for proximate cause applies in both involuntary manslaughter and murder cases. The Pennsylvania court in *Commonwealth v Root,* 403 Pa 571, 575; 170 A2d 310 (1961), persuasively reasoned:

> [T]he distinction between murder and involuntary manslaughter does not rest upon a differentiation in causation; it lies in the state of mind of the offender. If one kills with malice aforethought, he is chargeable with murder; and if death, though unintentional, results directly from his unlawful or reckless conduct, he is chargeable with involuntary manslaughter. In either event, the accused is not guilty unless his conduct was a cause of death sufficiently direct as to meet the requirements of the *criminal,* and not the *tort,* law. [Emphasis in original.]

B

A review of the medical evidence reveals the following:

1. A bullet, shot by defendant Bush, lacerated Mr. Dudley's heart. Dr. Kaplan performed emergency surgery. Dr. Kaplan reported that Mr. Dudley was eventually discharged in good condition.

2. There are two types of heart failure. One is chronic heart failure, a continued, progressive disease of the heart. Chronic heart failure is evidenced by edema or swelling of the heart, as well as thickening of the ankles, and fluid in the lungs. The autopsy of Mr. Dudley did not show signs indicative of chronic heart failure. The other type of heart failure is acute, or sudden, heart failure.

3. Dr. Kanluen, the medical examiner who performed the autopsy, opined that Mr. Dudley's death was due to an acute heart attack, which was the consequence of the permanent damage to the heart from the previous gunshot wound.

4. Dr. Petinga concluded that the cause of death was acute congestive heart failure caused by the gunshot wound.

5. Dr. Kanluen failed to perform a full examination of Mr. Dudley's brain. The results from the missing examination may have supported the defendants' theory of brain death.

On the basis of the testimony, a rational trier of fact could have concluded, beyond a reasonable doubt, that the initial attack contributed to the victim's death. *But for* the gunshot wound, Mr. Dudley would not have died. The problem with

this conclusion, however, is that this is not evidence of proximate cause, but actual cause.[6] Thus, the Court of Appeals conclusion that the required proof of proximate cause was established because the medical testimony was sufficient to establish the cause of death was erroneous. The medical testimony proved actual cause. The question regarding proximate cause remains.

C

Intervening or superseding causes negate proximate cause. A series of events, immediately preceding Mr. Dudley's death, are relevant to the proximate cause inquiry.

Mr. Dudley's testimony acknowledged the limitations his doctor placed on his physical activities. Yet he chose to disregard his doctor's instructions.[7] The events that transpired immediately before his death evidenced Mr. Dudley's deviation from his recommended lifestyle:

1. Mr. Dudley participated in a game of two-on-two basketball for ninety minutes. The other participants were young men in good health.

2. Despite experiencing shortness of breath and tiredness during the basketball game, Mr. Dudley continued to play following a brief break.

3. The disclosed wager between two of the players, as well as the testimony of the wit-

[6] For actual cause, "it is almost always sufficient . . . that 'but for' the antecedent conduct the result would not have occurred." LaFave & Scott, supra, § 3.12(b), p 279.

[7] As the majority noted: Gladys Dudley testified that in 1986 her son " 'could tell that he wasn't improving and he decided that whatever he did he had to live as normal a life as possible . . . .' " Ante, p 697, n 4.

nesses, revealed that this was not a slow
leisurely game but a game of elevated compe-
tition.

4. Following the game, Mr. Dudley initiated a
fight with his eighteen-year-old brother-in-law.
Mr. Dudley swung at his brother-in-law,
Monte, because of his mistaken belief that
Monte had hit Mrs. Dudley. After Monte hit
Mr. Dudley in the nose, Mr. Dudley chased
after Monte, leaping on him. When the two
men hit the ground, Mr. Dudley landed un-
derneath Monte, who weighed between 165
and 170 pounds. Another man joined in the
fight, placing Mr. Dudley under the weight of
two grown men. Monte testified to striking
the victim while he was on the ground. The
altercation continued for three to five min-
utes, ending when Mr. Dudley began to con-
vulse.

The victim was advised not to participate in stren-
uous activity. Nevertheless, he played basketball
for ninety minutes. The victim also initiated a
physical altercation, leaving him pinned beneath
two grown men. Mr. Dudley's disregard for his
recommended physical activities is a superseding
cause, negating proximate cause.[8]

If A wounds B with the intent to kill, but there-
after C shoots B with intent to kill and does kill
him instantly, we know that A is not the cause of
B's death. If, instead, B takes his own life, we again
have a deliberate act directed toward killing B
which was intervened, so one might expect the
same result. Such a result is certainly appropriate
when B commits suicide from *some motive uncon-*

---

[8] This position is consistent with the testimony of Dr. Lee, Mr.
Dudley's cardiologist. Dr. Lee characterized Mr. Dudley's participa-
tion in the forbidden acts as commensurate with suicide.

*nected with the fact that he is wounded,* but suicide is not abnormal when B acts out of the extreme pain of wounds inflicted by A or when the wound has rendered him irresponsible. [LaFave & Scott, *supra,* § 3.12(f)(4), p 290.]

The prosecutor's proofs do not reveal a victim who was so distraught as a result of his injuries or resulting limitations that he committed suicide. Instead, the victim returned to steady employment, married, fathered a child and resumed a seminormal life. Mr. Dudley, fully aware of his limitations, participated in strenuous physical activities. Furthermore, he failed to slow down when he began to experience shortness of breath and tiredness. While unfortunate, the victim, by participating in activities that would be taxing to a healthy individual, proximately caused his own demise.

Mr. Dudley acted contrary to his physician's orders. His participation in a ninety-minute game of basketball and a fistfight was certainly not motivated by his assault over four years earlier. The autopsy revealed that Mr. Dudley did not die because of a chronic, progressive heart condition, but because of acute or sudden heart failure. When reviewing this fact, along with the forbidden physical activities that immediately preceded his death, I am convinced that the prosecutor failed to prove beyond a reasonable doubt that the defendants' acts were the proximate cause of Mr. Dudley's death. The intervening factors, as chronicled above, proximately caused Mr. Dudley's death.

II

On the basis of the evidence and the intervening events negating proximate cause, I would hold that the prosecutor failed to prove all the elements

of felony murder beyond a reasonable doubt. Accordingly, I would vacate the Court of Appeals action in its entirety,[9] and reverse the defendants' convictions of felony murder and Bush's accompanying conviction of felony-firearm.

LEVIN, J., concurred with CAVANAGH, C.J.

[9] While defendant Harding failed to raise a sufficiency of the evidence argument on appeal, I would nevertheless grant him relief to avoid a miscarriage of justice. See *Napier v Jacobs,* 429 Mich 222, 234-235; 414 NW2d 862 (1987).