*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

AL-HASSAN WALID AIYASH,

        Defendant-Appellant.

FOR PUBLICATION
September 25, 2024
10:26 AM

No. 369689
Wayne Circuit Court
LC No. 23-002711-01-FH

Before: O'BRIEN, P.J., and CAVANAGH and SHAPIRO*, JJ.

O'BRIEN, P.J.

Samuel McCray went into a Detroit gas station around three o'clock in the morning on May 6, 2023, and tried to buy about four dollars' worth of snacks and beverages. Defendant was working as the gas-station attendant at the time. After McCray's card was declined, McCray threatened to kill defendant and tried to leave with the unpaid-for merchandise. Defendant stopped McCray by remotely locking the gas station's only door, trapping McCray and three other patrons inside the gas-station store. Standing behind bulletproof glass, defendant mocked McCray while the other three patrons pleaded with defendant to unlock the door. Defendant initially refused, allowing the situation in the store to escalate for several minutes before finally unlocking the door. But by that time, it was too late—McCray believed that one of the other patrons, Gregory Kelly, had insulted him, so McCray took out a gun and shot Kelly nine times, killing him. McCray shot another patron, David Langston, three times, and the third patron, Anthony Bowden, three or four times. On these facts, the prosecution seeks to hold defendant criminally liable for Kelly's death under a theory of involuntary manslaughter. The district court bound defendant over on the charge, and the circuit court affirmed. This case now comes to this Court on leave granted.[1]

The central question presented in this case is one of proximate cause: was defendant a proximate cause of Kelly's death, or did an intervening event—McCray's shooting and killing of

---

[1] See *People v Aiyash*, unpublished order of the Court of Appeals, entered March 19, 2024 (Docket No. 369689).

---

*Former Court of Appeals judge, sitting on the Court of Appeals by assignment.

-1-

Kelly—sever any causal link between defendant's conduct and Kelly's death? For purposes of holding defendant criminally liable for Kelly's death, we conclude that McCray's intentional misconduct was not reasonably foreseeable, so it severed any causal link between defendant's conduct and Kelly's death.[2] We therefore reverse.

## I. BACKGROUND

Video captured the events leading up to McCray's killing of Kelly, as well as the shooting itself.[3] On May 6, 2023, at approximately 3:01 a.m., McCray entered the gas-station store. He selected about $4.00 worth of items from the beverage and snack aisles and walked towards the checkout area, which was a sealed booth surrounded by what appears to be bulletproof glass or plastic. McCray placed his items in the circular swivel located at the center of the checkout counter and walked over to the register. In the sealed booth behind the transparent bulletproof barrier, defendant bagged McCray's items, placed them back in the circular swivel, and walked over to the register to meet McCray. A conversation ensued between defendant and McCray about the quantity and price of the goods.

Between 3:03 a.m. and 3:04 a.m., two additional customers, Langston and Kelly, entered the gas-station store. They waited behind and to the side of McCray as McCray and defendant continued their conversation about McCray's payment. McCray's card was eventually declined, which caused McCray to raise his voice at defendant saying, "You're making it hard. You're making it stupid," and, "He acting stupid as fuck right now." Defendant responded, "No, you're being slow right now. I'm asking you how many candies do you have bro?"

At 3:05 a.m., as defendant and McCray continued their heated discourse, a third patron, Bowden, entered the store. Shortly afterwards, McCray threatened defendant, yelling, "I'll kill you. Come out here and get your brains on the floor. Shut up. Shut up. Shut up, before I put your brains on the floor and I take this shit." Defendant replied, "Nah, I ain't worried about you bro. Put your fucking pin in bro. The fuck is wrong you with you? You ain't taking shit. I can lock you in this bitch." McCray headed to the door with the bag of items as defendant repeatedly stated, "You ain't taking shit." At some point before McCray reached the door to the gas station, defendant remotely locked it. After McCray found the door locked, he walked back to the checkout counter—where Langston and Kelly were still waiting—to further threaten defendant.

During the ensuing minutes, the patrons inside the gas station repeatedly tried to open the gas station's door, including McCray again, who at one point tried kicking the door open. Between 3:06 a.m. and 3:07 a.m., Langston, Bowden, and Kelly pleaded with defendant to unlock the gas-station store's only door, while McCray continued yelling and acting belligerent. Defendant

---

[2] Our decision does not preclude civil claims arising out of the events underlying this case. We decide only that, under the facts presented at the preliminary hearing, defendant may not be subject to a charge of involuntary manslaughter. The standard for imposing civil liability is less demanding than the standard for imposing criminal liability, as this opinion explains.

[3] McCray is charged with multiple felony offenses, including first-degree premeditated murder, MCL 750.316(1)(a), in a separate proceeding.

refused to unlock the door, and instead contacted emergency services to report McCray's refusal to pay for or return the $4.00 worth of snacks and beverages.

The video shows McCray becoming visibly more frustrated and erratic the longer the door remained locked. While a gun is not visible in the video, Langston testified that, when he walked into the gas station, he saw that McCray had a gun on his hip underneath his shirt. At 3:08 a.m., McCray engaged Kelly, pointing a finger in Kelly's face while yelling, and Langston stepped in between Kelly and McCray to diffuse the situation. Kelly went back to the checkout counter to continue speaking to defendant, while McCray stepped around Langston, walked over to the checkout counter, grabbed a beverage container, and launched it at the partition in front of where Kelly was standing next to Bowden (both were standing in front of defendant). Both Kelly and Bowden turned and yelled at McCray, and Kelly started walking towards him. Langston grabbed Kelly and placed himself between Kelly and McCray in an attempt to diffuse the situation a second time. Once the two were separated, McCray began pacing near the door while the other patrons gathered at the counter to plead with defendant, who still had not unlocked the door.

At 3:09 a.m., defendant motioned to the patrons with his hand to leave the gas-station store while yelling, "Get the fuck on bro. Get the fuck on," as he pressed a button that would unlock the door. In its description of the video, the circuit court opined that "[t]here is no indication that anyone realized that the door was unlocked" at this point. As Kelly walked towards the door, McCray was waiting to confront him, seemingly acting on the mistaken belief that Kelly called him a "bitch"—McCray can be heard in the video saying, "Call me a bitch [inaudible]. Put one in your head." McCray and Kelly were briefly face to face and exchanged more words. Langston again tried to step in between the two to diffuse the situation, but as he did so, McCray pulled a gun out of his waistband and started shooting.

McCray fired multiple shots at Kelly, who collapsed to the floor. McCray instantly turned to Langston, who was trying to hide behind some shelving, and fired multiple times at him. McCray then turned to Bowden, who was crouched in a corner of the gas-station store with his hand in the air, and fired multiple times at him. McCray then turned his attention back to Kelly, who was on the ground motionless, and fired several more shots at Kelly's body. McCray tried to shoot Langston again, but his clip was empty. All told, McCray shot Kelly nine times, Langston three times, and Bowden three or four times. Kelly succumbed to the gunshot wounds. There were approximately four minutes between defendant locking the gas-station door and the shooting.

At 3:10 a.m., Bowden exited the gas-station store, followed by McCray, while defendant remained behind the glass partition and contacted emergency services. Langston left the gas station store at approximately 3:11 a.m., and law enforcement arrived at the premises at 3:12 a.m.

After the close of proofs at the preliminary examination, the prosecution requested a bindover on the involuntary-manslaughter charge. The district court approved the request, opining:

> The nuts and bolts of this case boil down to whether the shooter's actions were a superseding intervening cause. We know that the defendant, who was the store clerk, so to speak, at this location, locked the patrons in after he thought that the shooter was trying to steal less than $5 worth of merchandise, or the shooter

-3-

believed that he paid for it and his card shouldn't have been declined. The defendant, however, I think exacerbated the situation, provoked the shooter, got him really amped up and hyped up by telling him you're locked in and you're not going to do anything, and by locking the door.

The district court accordingly bound defendant over to the circuit court on the involuntary-manslaughter charge.

Defendant filed a motion to quash the bindover in circuit court, contending that the prosecution failed to establish that defendant was the factual or proximate cause of Kelly's death. Following briefing and oral argument, the circuit court issued a written opinion and order denying defendant's motion. After reviewing the relevant facts and caselaw, the circuit court concluded, in relevant part, that the district court did not abuse its discretion by binding defendant over for trial because there was probable cause to believe that defendant was a proximate cause of Kelly's death, reasoning:

> While this is a close case, given all these facts it was not an abuse of discretion for the District Court to conclude that there was probable cause to believe that it was reasonably foreseeable that Mr. McCray would commit the shootings that day. Mr. McCray explicitly threatened to kill [defendant] by telling him "come out here and get your brains on the floor" multiple times. Both surviving victims also testified that Mr. McCray threatened to kill everyone in the store. While Mr. Kelly confronted Mr. McCray and called him a "bitch" prior to the shooting, it was the defendant's actions in locking the door, directing the customers to make the shooter pay, and verbally escalating the situation that led to the shooting. . . . While Mr. McCray's actions were intentional, a rational trier of fact could find that they were reasonably foreseeable. For these reasons, the People established actual and proximate causation to a probable cause standard.

The circuit court set the matter for trial. This appeal ensued.

## II. STANDARD OF REVIEW

Defendant argues that the district court abused its discretion when it bound defendant over for trial. We agree.

This Court in *People v Crumbley*, ___ Mich App ___; ___ NW3d ___ (2023) (Docket Nos. 362210 and 362211), slip op at 11, clarified the standard of review applicable to reviewing a circuit court's decision granting or denying a motion to quash a bindover:

> In the context of reviewing a district court's bindover decision, the order on appeal is the circuit court's decision denying the motion to quash, which we review de novo (i.e., with no deference) because the dispositive question is whether the district court abused its discretion in binding over defendants. Thus, although we give no deference to the circuit court's findings in its review of the district court decision, we give a great deal of deference to the district court's decision, that is, we review that decision for an abuse of discretion.

At its core, an abuse of discretion standard acknowledges that there will be circumstances in which there will be no single correct outcome; rather, there will be more than one reasonable and principled outcome. An abuse of discretion occurs when a decision falls outside the range of reasonable and principled outcomes, and a trial court necessarily abuses its discretion when it makes an error of law. However, [t]o the extent that a lower court's decision on a motion to quash the information is based on an interpretation of the law, appellate review of the interpretation is de novo. [*Id.* (quotation marks and citations omitted).]

## III. ANALYSIS

"The purpose of a preliminary examination is to determine whether a crime was committed and whether there is probable cause to believe that the defendant committed it." *People v Rogers (On Remand)*, 338 Mich App 312, 330-331; 979 NW2d 747 (2021) (quotation marks and citation omitted). In specific terms, "in order to bind a defendant over for trial in the circuit court, the district court must find probable cause that the defendant committed a felony based on there being evidence of each element of the crime charged or evidence from which the elements may be inferred." *People v Simon*, 339 Mich App 568, 580; 984 NW2d 800 (2021) (quotation marks and citation omitted). "Probable cause requires enough evidence to cause a person of ordinary caution and prudence 'to conscientiously entertain a reasonable belief' of the defendant's guilt." *People v Ridge*, 319 Mich App 393, 403; 901 NW2d 406 (2017), quoting *People v Yost*, 468 Mich 122, 126; 659 NW2d 604 (2003). "The district court abuses its discretion by binding over a defendant when the prosecution has failed to present sufficient evidence to support each element of the charged offense." *Simon*, 339 Mich App at 580.

To convict a defendant of involuntary manslaughter, the prosecution must establish that the defendant unintentionally caused the death of another "with a lesser mens rea of gross negligence or an intent to injure, and not malice." *People v McMullan*, 284 Mich App 149, 152; 771 NW2d 810 (2009), aff'd 488 Mich 922 (2010) (quotation marks and citation omitted). "In criminal jurisprudence, the causation element of an offense is generally comprised of two components: factual cause and proximate cause." *People v Schaefer*, 473 Mich 418, 435; 703 NW2d 774 (2005). While the causation element in criminal cases overlaps with the causation element in civil cases, "[a]s a matter of historical fact, the rules of causation in criminal cases are not tied to the rules of causation in civil cases." *People v Tims*, 449 Mich 83, 105; 534 NW2d 675 (1995). More specifically, "the criminal standard for proximate cause requires a more direct causal connection than the tort concept of proximate cause." *People v Harding*, 443 Mich 693, 738; 506 NW2d 482 (1993) (CAVANAGH J., concurring in part and dissenting in part), abrogated by *People v Ream*, 481 Mich 223 (2008).

Proximate causation in criminal cases "is a legal construct designed to prevent criminal liability from attaching when the result of the defendant's conduct is viewed as too remote or unnatural." *People v Feezel*, 486 Mich 184, 195; 783 NW2d 67 (2010) (quotation marks and citation omitted). Stated differently, for a criminal defendant's conduct to be the proximate cause of a victim's injury, the "injury must be a direct and natural result of the defendant's actions." *Schaefer*, 473 Mich at 436 (quotation marks and citation omitted). This determination turns on whether it was reasonably foreseeable that the defendant's conduct would result in the victim's injury. *People v Rideout*, 477 Mich 1062, 1062; 728 NW2d 459 (2007). Both the resulting harm

and the manner in which the harm occurred must have been reasonably foreseeable to establish proximate cause. See *Tims*, 449 Mich at 105; *Rideout*, 477 Mich at 1062.

This analysis does not change if the victim's injury was technically caused by the defendant's conduct but actually resulted from an intervening event; the analysis merely shifts to determining whether the intervening event was reasonably foreseeable. *Schaefer*, 473 Mich at 436-437. "If it was reasonably foreseeable, then the defendant's conduct will be considered a proximate cause." *Id*. at 437. If the intervening event (more commonly referred to as an "intervening cause") was not reasonably foreseeable, "then generally the causal link is severed and the defendant's conduct is not regarded as a proximate cause of the victim's injury or death." *Id*. at 437-438. A third party's intentional misconduct is not reasonably foreseeable unless facts exist that would have tended to make the third party's misconduct foreseeable. *Crumbley*, ___ Mich App at ___; slip op at 14.

Assuming without deciding that defendant's conduct was a factual cause of Kelly's death,[4] the prosecution at the preliminary examination failed to present sufficient evidence to support that defendant was a proximate cause of Kelly's death. That is, based on the evidence presented, a person of ordinary caution and prudence could not conscientiously entertain a reasonable belief that McCray's intentional misconduct was reasonably foreseeable. McCray's intentional misconduct therefore severed the causal link between defendant's conduct and Kelly's death.

Nothing in the record suggests that defendant had previously interacted with McCray, knew McCray was dangerous, or knew McCray had mental-health issues. Nor does anything in the record suggest that defendant was aware of any animosity between McCray and any of the other patrons, including Kelly. As tense as the situation was before and after defendant locked the door, nothing in the record suggests that defendant knew that McCray was armed or that he posed a threat to the other patrons. While it is true that McCray threatened to kill defendant and the other patrons, McCray made the threats because he was upset that defendant would not allow him to leave the gas station without paying for roughly $4.00 worth of snacks and beverages. Unsurprisingly, given this context, no one in the gas station took McCray's threats seriously— after McCray threatened to kill everybody in the store, the other three patrons continued standing by McCray yelling at defendant. Even Langston, who testified that he saw that McCray was armed, did not appear to take McCray's threats seriously. Langston testified (and video confirms) that, after McCray made the threats, Langston approached McCray and tried to talk to him.

The district court and circuit court reasoned that McCray's intentional misconduct may have been reasonably foreseeable on the basis of McCray's verbal threats and defendant's conduct escalating the situation—defendant's locking the patrons in the gas station, directing other patrons to make McCray pay for his snacks and beverages, and verbally mocking McCray. But, at least for purposes of imposing criminal liability, none of defendant's conduct made it reasonably

---

[4] Defendant disputes whether his conduct was a factual cause of Kelly's death, but it is unnecessary to address this argument because we conclude that McCray's intentional killing of Kelly was a superseding cause of Kelly's death, severing any causal link between defendant's conduct and Kelly's death.

foreseeable that McCray would intentionally kill another patron. While it was certainly foreseeable that defendant's conduct would anger McCray, it was not reasonably foreseeable that making McCray angry would cause him to intentionally kill another patron, especially considering defendant's utter lack of knowledge about McCray. Even McCray's threats to shoot the other patrons did not make it reasonably foreseeable that he would do so because nothing in the record suggests that defendant knew either that McCray was armed or that McCray's judgment was so compromised that he would actually shoot innocent bystanders over a dispute with defendant.

In short, given defendant's lack of knowledge about McCray and the circumstances leading up to the shooting, the evidence at the preliminary hearing was insufficient to establish that it was reasonably foreseeable that McCray would shoot and kill Kelly. The evidence instead tended to establish that McCray's intentional misconduct was not reasonably foreseeable, "which, of course, is generally the case." *Crumbley*, ___ Mich App at ___; slip op at 14 And because McCray's intentional misconduct was not reasonably foreseeable, it severed any causal link between defendant's conduct and Kelly's death for purposes of holding defendant criminally liable for Kelly's death. See *Schaefer*, 473 Mich at 437-438.

We note that, historically, it has been exceedingly rare to hold that a defendant can be found criminally liable for the intentional misconduct of a third party. Still, this Court recently did so in *Crumbley*. Because the prosecution relies heavily on that case to support its arguments, we believe it prudent to address *Crumbley* and explain why it does not control the outcome of this case. The facts of *Crumbley* were extraordinary, as the majority there recounted:

> [T]he relevant facts revealed that, prior to arriving at the school on November 30, 2021 [the day that EC murdered four classmates in a school shooting]: (1) defendants were aware that EC had been repeatedly experiencing significant episodes of hallucinations and/or extreme paranoia; (2) EC was in a distressed mental state because of the loss of his grandparent and the family dog, and the departure of his best friend; (3) EC himself realized his poor mental state such that he requested defendants to help him obtain medical assistance; (4) despite defendants' knowledge of EC's mental state, they purchased him a handgun which was readily accessible to EC; (5) on November 29, the day before the shootings, EC was researching bullets while in school; and (6) during first hour of class on November 30, EC watched a video involving a shooting, and during second hour drew pictures of a bullet, a gun resembling the SIG Sauer, a person bleeding from bullet holes, and wrote "Blood everywhere," "The thoughts won't stop Help me," "My life is useless," and "The world is dead." Defendants were also presented with the significant modifications EC made to that worksheet, where he clearly intended to portray a different, happier message about the school and himself.

> Despite their knowledge of all of these circumstances, when given the option to help EC and take him out of school, defendants did nothing. They did not, contrary to the recommendations of [the school counselor], take EC home and get him immediate medical help. Nor, when they decided to leave him at school, did they tell school officials about EC's history of mental health issues nor explain to them that EC had access to a gun similar to the one he drew on the math worksheet. Defendants neither asked EC if he had the gun with him nor did they

look in his backpack. And, when they left the school, defendants did not go home and ensure EC had not taken the gun.

> Given all those facts, it was not an abuse of discretion to conclude that there was probable cause to believe that a juror could conclude that a reasonably foreseeable outcome of defendants' alleged gross negligence was EC committing a shooting that day. One of the few reasonably foreseeable outcomes of failing to secure the firearm that was gifted to EC was that it would be accessible to EC and that, in his mentally deteriorated condition, he might use it in unlawful ways. In light of those foreseeable events, when presented with what he had just drawn, written, and viewed that morning, a reasonable juror could conclude that it was foreseeable that EC possessed his recently gifted gun and intended to use it that day. As a result, a reasonable juror could conclude that EC's intervening acts were not a superseding cause of the murders. [*Crumbley*, ___ Mich App at ___; slip op at 14-15.]

For all of defendant's bad choices in this case—locking McCray and the other patrons in the store, verbally taunting McCray thereby escalating the situation, and refusing to unlock the gas station door despite the patrons pleading with him to do so—he simply lacked knowledge similar to that of the defendants in *Crumbley* which made EC's intentional misconduct in that case reasonably foreseeable. *Crumbley* faithfully applied existing precedent to the facts before it, but we heed the panel's warning that its decision was limited to the "uniquely troubling facts" of that case. *Id*. at ___; slip op at 16. *Crumbley* did not create a new rule opening the door to prosecutions like the one in this case. Rather, as *Crumbley* itself recognized, holding a defendant criminally liable for a third party's intentional misconduct remains the exception, not the rule. *Id*. at ___; slip op at 14.

Accordingly, while defendant's wrongful conduct may still expose him to criminal liability, we hold that the facts of this case do not support an involuntary-manslaughter charge because the evidence is insufficient to establish that defendant was a proximate cause of Kelly's death. Accord *People v Marshall*, 362 Mich 170, 172-174; 106 NW2d 842 (1961) (explaining that the defendant, who knowingly turned over his car keys to a drunken friend, was guilty of violating the section of the Michigan vehicle code prohibiting such conduct, but could not be found of guilty of involuntary manslaughter in relation to a motorist that was killed after the defendant's drunken friend drove the defendant's car the wrong direction down the highway and killed the motorist).

Reversed.

/s/ Colleen A. O'Brien
/s/ Mark J. Cavanagh
/s/ Douglas B. Shapiro